EAST TEXAS MOTOR FREIGHT LINES, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7981. Promulgated August 19, 1946.

*Robert Ash, Esq.*, and *W. T. Durant, Esq.*, for the petitioner.
*Jacquin D. Bierman, Esq., Irene F. Scott, Esq.*, and *R. E. Maiden, Jr., Esq.*, for the respondent.

OPINION.

BLACK, *Judge*: The question presented is whether petitioner is entitled to any relief from excess profits tax for the fiscal years ended June 30, 1941, 1942, and 1943, under the provisions of section 722 of the Internal Revenue Code, as amended, and, if so, the amount thereof. The material provisions of section 722 are in the margin.[1]   The applicable regulations for the fiscal years ended June 30, 1941 and 1942, are found in Regulations 109, as amended by T. D. 5264, 1943 C. B. 761, and T. D. 5415, 1944 C. B. 404.   The applicable regulations for the fiscal year ended June 30, 1943, are found in Regulations 112, as amended by T. D. 5415.

---

[1] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise

Under the statute petitioner must establish (1) that the tax computed without the benefit of section 722 results in an excessive and discriminatory tax and (2) a fair and just amount representing normal earnings to be used as a constructive average base period net income. If petitioner establishes these two requirements, then the tax shall be determined by using such constructive average base period net income in lieu of the actual average base period net income otherwise determined under the statute. In determining (2) no regard shall be had to events or conditions affecting petitioner, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, with certain exceptions not material here.

We shall first consider whether petitioner has established (1) above. It is conceded that petitioner is entitled to use the excess profits credit based on income pursuant to section 713. Therefore, the tax shall be considered to be excessive and discriminatory if petitioner's actual average base period net incomes of $61,292.49 for the fiscal year 1941 and $75,324.52 for each of the fiscal years 1942 and 1943 are an inadequate standard of normal earnings because of the existence of such

determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, except * * *.

(b) Taxpayers Using Average Earnings Method.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

* * * * * *

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purposes of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, a difference in the ratio of nonborrowed capital to total capital, and the acquisition before January 1, 1940, of all or part of the assets of a competitor, with the result that the competition of such competitor was eliminated or diminished. * * * or

(5) of any other factor affecting the taxpayer's business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period and the application of this section to the taxpayer would not be inconsistent with the principles underlying the provisions of this subsection, and with the conditions and limitations enumerated therein.

* * * * * * *

(d) Application for Relief Under This Section.—The taxpayer shall compute its tax, file its return, and pay the tax shown on its return under this subchapter without the application of this section, except as provided in section 710 (a) (5). The benefits of this section shall not be allowed unless the taxpayer within the period of time prescribed by section 322 and subject to the limitation as to amount of credit or refund prescribed in such section makes application therefor in accordance with regulations prescribed by the Commissioner with the approval of the Secretary. * * *

factors as are mentioned in subparagraphs (4) and (5) of subsection (b) of section 722.

No facts were presented to the respondent in support of petitioner's claim for relief under subparagraph (5) of section 722 (b). Therefore, petitioner's claim for relief under subparagraph (5) of section 722 (b) is not properly before us. *Blum Folding Paper Box Co.*, 4 T. C. 795; *Monarch Cap Screw & Manufacturing Co.*, 5 T. C. 1220. This leaves for our consideration whether petitioner has established the existence of such factors as are mentioned in subparagraph (4) of section 722 (b). Petitioner's claim before the respondent was specifically grounded upon section 722 (b) (4), and its contentions here are likewise specifically grounded upon the same section.

We think the evidence before us clearly proves that "during * * * the base period" petitioner "changed the character" of its business. Prior to the acquisition of the three new routes from Dallas to Fort Worth, from Texarkana to Memphis, and from Memphis to St. Louis, petitioner was predominantly an intrastate carrier. Thereafter its business was that of an interstate carrier, as well as an intrastate carrier. These acquisitions not only added approximately 600 miles of additional territory to be served by petitioner, but opened up an entirely new type of operation, namely, the straight load or key point operation as distinguished from the old interchange or joint haul operation. Under this new type of operation petitioner was able to haul more freight at a considerably lesser cost per ton of freight hauled. This resulted in larger profits for petitioner. We think that these changes can reasonably be regarded as "a change in the operation * * * of the business, a difference in the * * services furnished, [and] a difference in the capacity for * * * operation" as those terms are used in section 722 (b) (4), as follows:

* * * For the purposes of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation * * *.

The term "change in the character of the business" may include other situations than those specifically mentioned in the statute, but since we are satisfied that petitioner has shown that at least three of the situations there mentioned are present here, we think it follows that petitioner has shown that during the base period it changed the character of its business, and we have so found as one of our ultimate facts.

It is not enough for petitioner to establish merely that during the base period it changed the character of its business. It must also establish that "the average base period net income does not reflect the normal operation for the entire base period of the business."

As set out in our findings, the actual "average base period net income" for the fiscal year ended June 30, 1941, is $61,292.49, and for each of the fiscal years ended June 30, 1942 and 1943, it is $75,324.52. As a preliminary step in determining the average base period net income, it is necessary first to determine the "excess profits net income" for each of the base period years under section 711 (b). Due to the repeal of section 711 (b) (1) (A), effective with respect to taxable years beginning after December 31, 1940, the "excess profits net income" for each of the base period years is greater for the last two fiscal years here involved than it is for the fiscal year ended June 30, 1941. As set out in our findings, the excess profits net income determined under section 711 (b) for each of the base period years to be considered for each of the excess profits tax taxable years here involved is as follows:

| Taxable years in base period | Year ended 6–30–1941 | Years ended 6–30–1942 and 1943 |
|---|---|---|
| June 30, 1937 | $4,442.10 | $5,299.38 |
| June 30, 1938 | 10,606.72 | 12,115.58 |
| June 30, 1939 | 46,201.93 | 57,039.42 |
| June 30, 1940 | 62,664.36 | 76,986.80 |
| Total | 123,915.11 | 151,441.18 |
| General average | 30,978.78 | 37,860.30 |

If petitioner's actual average base period net income had been determined under section 713 (e), it would have amounted to $30,978.78 for the fiscal year ended June 30, 1941, and $37,860.30 for each of the next two fiscal years. But, since petitioner's aggregate excess profits net income for the last half of its base period is greater than such aggregate for the first half, petitioner is entitled under section 713 (d) to have its average base period net income determined under section 713 (f). The result of the computation under section 713 (f) is that the actual average base period net income is eleven-twelfths of petitioner's excess profits net income for the fiscal year ended June 30, 1940, plus one-twelfth of petitioner's excess profits net income for the fiscal year ended June 30, 1939, which amounts to $61,292.49 for the fiscal year ended June 30, 1941, and $75,324.52 for each of the two following fiscal years. The respondent contends, therefore, that, since petitioner's actual average base period net income is not the general average of petitioner's excess profits net income for the four base period years, but is substantially (over 97.8 per cent) the excess profits net income for the last year in the base period, which was petitioner's best year in the base period and was subsequent to the acquisition of the three new routes, such actual average base period net income must be considered as reflecting the normal operations of the changed busi-

ness and that, therefore, petitioner is not entitled to any reilef under section 722.

While it is true that petitioner changed the character of its business during the third year of its base period, that the fourth year of its base period represented the results of over a full year of operations under changed conditions, and that petitioner's actual average base period net income as determined under section 713 (f) amounts to more than 97.8 per cent of its excess profits net income earned during the fourth year of petitioner's base period, we think petitioner has shown, as hereinafter more fully indicated, that such actual average base period net income does not reflect the normal operation for the entire base period.

The second paragraph of section 30.722–3 (d) of Regulations 109, as amended by paragraph 2 of T. D. 5264, *supra*, and the second paragraph of section 35.722–3 (d) of Regulations 112 are identical and provide in part that:

* * * Generally, business experiences a time lag between the time that new operations are commenced, reflecting either the starting of a new business or of a business essentially different in character from an old business, and the attainment of a normal earning level. If all or a portion of this time lag occurs during the base period, the earnings during such period cannot be said to represent normal average earnings.

In its application for relief filed with the respondent on Form 991, petitioner stated in part:

It is well recognized fact in this industry that it requires three and one-half to four years for a carrier to take over an operating right or certificate and develop the tonnage to a normal volume. Taxpayer was required to conduct a direct solicitation campaign among shippers to convince them of their ability to render more satisfactory service and to prove their financial responsibility.

In order to substantiate the above statement and also for other purposes, petitioner introduced the testimony of its president, O. P. Thornhill, and two other witnesses, W. W. Callan and Evans A. Nash. All of these witnesses were men of considerable experience in the motor carrier industry and held responsible executive positions in their respective companies. Thornhill testified that it took two to three years to develop fully a new line after it was acquired and that a normal level of operations could not be reached before that time. Callan was of the opinion that it took in excess of two years, and Nash said it would take three or four years to reach a normal level of operations.

We find as an ultimate fact from all the evidence in the record that the average base period net income does not reflect the normal operation for the entire base period of petitioner's business.

The next provision of section 722 (b) (4) is as follows:

If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time.

In view of our finding that the average base period net income (which in this proceeding actually amounts to approximately 97.8 per cent of petitioner's excess profits net income for the last year of the base period) did not reflect the normal operation for the entire base period, and in view of the evidence that it takes from two to four years to fully develop a new line after it is acquired, we think it necessarily follows as a logical sequence that as a matter of fact petitioner's business did not reach, by the end of the base period, the earning level which it would have reached if petitioner had made the change in character two years before it did so. Counsel for petitioner, in framing his questions to his witnesses as to this provision of the statute, kept asking them whether petitioner had reached a normal level of earnings by *December 31, 1939.* For instance one of the questions posed to Thornhill was: "Now, why is it, or on what do you base that opinion that you could not, or rather did not reach this normal level by December 31, 1939?" Another was: "Do you have an opinion as to whether or not the integrated system, that is to say, your original plant, with these * * * three new routes that you added in 1938 and 1939, reached a normal overall level of operations or normal earnings level by December 31, 1939?" Callan was asked: "Do you have an opinion * * * as to whether or not the earlier acquisition of these three new lines would have had any effect on the taxpayer's net income, by December 31, 1939?" Among the questions asked Nash was this: "Mr. Nash, bearing all of these things I have recited in mind * * * have you an opinion * * * as to whether or not these new routes * * * in connection with the time at which they were acquired by this taxpayer, had or could have reached a normal level of operations or a normal earnings level by December 31, 1939?" The respondent in his brief contends that the answers to such questions are "completely irrelevant under the statute" and, after quoting the above sentence from the statute beginning with "If the business of the taxpayer did not reach, etc.," the respondent continues as follows:

Thus the statute is different from the questions asked during the hearing in two respects. The statute is concerned with whether the taxpayer has reached *by the end of the base period,* and not as of December 31, 1939 as counsel for petitioner inquired, the earning level which would have been reached had the change been made two years earlier. The question is not whether a normal level of earnings had been reached by December 31, 1939 but whether the earning

level would have been any higher by the end of the base period if the change had been made two years earlier.

The respondent is, of course, correct in saying that the statute is concerned with whether the petitioner has reached by the end of the base period, which in the instant case was June 30, 1940, and not as of December 31, 1939, as counsel for petitioner inquired, the earning level which it would have reached if the petitioner had made the change two years earlier. In view, however, of the witnesses' other testimony that it would take anywhere from two to four years to develop fully a new line after it was acquired and that a normal level of operations could not be reached before that time, it is apparent that the answers to the above questions would have been the same if the critical date mentioned had been June 30, 1940 (the end of the base period) instead of December. 31, 1939. In using the latter date counsel for petitioner evidently had in mind the provision in section 722 (a) that in determining the constructive average base period net income "no regard shall be had to events * * * after December 31, 1939." That provision is material in the determination of the constructive average base period net income (the second requirement petitioner must establish if it is to obtain relief).

There is no merit, we think, in the respondent's criticism of the questions asked because of references made to "normal level," "normal overall level," and "normal earnings level," because the very thing petitioner is trying to establish under the first requirement stated at the beginning of this opinion is that petitioner's average base period net income is an inadequate standard of normal earnings because of the factors present in section 722 (b) (4).

Upon the entire record, we hold that petitioner has established that the tax computed without the benefit of section 722 results in an excessive and discriminatory tax.

We shall next consider whether petitioner has established (2) above, namely, what a fair and just amount representing normal earnings to be used as a constructive average base period net income would be.

Petitioner contends that, under all the evidence in the record, if this change had occurred two years before it did petitioner's net earnings for the *calendar year 1939* would have been from 100 to 200 per cent greater than they actually were. Thornhill's testimony was that they "would have been about 125 per cent more." Callan said "the taxpayer's net revenue would have been at least twice and perhaps as much as two and one-half or three times as great in 1939 had these lines been acquired at the earlier dates." Nash said "My opinion is that the earnings should have increased at least 100 per cent."

Since petitioner filed its returns on a fiscal year basis ending June 30, the record does not show what petitioner's net earnings were for the

calendar year 1939. The record does show the operating gross income by quarters, but it does not show the operating net income by quarters. From the showing of operating gross income by quarters, petitioner has determined that its gross revenue for the last half of the fiscal year 1939, which would also be the gross revenue for the first half of the calendar year 1939, was 56.7 per cent of the total gross revenue for the fiscal year 1939. Likewise, petitioner has determined that its gross revenue for the first half of the fiscal year 1940, which would also be the gross revenue for the last half of the calendar year 1939, was 51 per cent of the total gross revenue for the fiscal year 1940. Petitioner then assumes in its brief that, "All things being equal, 56.7 per cent of the gross revenues for the fiscal year 1939 should produce 56.7 per cent of the net operating income for that same year. By the same token, 51 per cent of the gross revenues for fiscal year 1940 should produce 51 per cent of the net operating income for fiscal year 1940." Petitioner, therefore, takes 56.7 per cent of the operating net income for fiscal year 1939 of $48,835.48, which is $27,689.72, and adds to that 51 per cent of the net operating income for fiscal year 1940 of $82,051.72, which is $41,846.38, and arrives at a total of $69,536.10, which latter amount petitioner contends should be used as representing the operating net income for the calendar year 1939. Petitioner then multiplies $69,536.10 by 225 per cent (see Thornhill's testimony above) and arrives at the amount of $156,456.23, which petitioner contends produces the "reconstructed net operating income for calendar year 1939."

The Bulletin on Section 722 of the Internal Revenue Code (hereinafter referred to as the bulletin), part V, subpart II (B) (1) (a), page 67, issued by the Commissioner on November 2, 1944, provides: "The computation of normal earnings must be based upon normal operations of the business for the *entire base period*."

The bulletin, part V, subpart II (B) (3), page 86, also provides:

Under the statute the constructive average base period net income must reflect the normal operation of the business for the entire base period. As a practical matter, this requires that normal earnings attributable to normal operating conditions at the end of the base period must first be established under the push-back rule. Therefore, if the earning level attained at the end of the base period is less than the level it would have reached had the commencement or change been made two years earlier, the taxpayer is given an additional period of two years within the framework of base period conditions to establish what the earning level at the end of the base period would have been after such additional period.

The basic steps in the computation of normal earnings are, therefore, the following:

(a) Determine whether by the end of the base period the taxpayer has reached the level of earnings it would have reached had it commenced business or made the change two years before it did.

(b) If this determination is in the negative, determine what the normal

earning level would have been at the end of the base period if the business had been commenced or changed in character two years earlier.

(c) Having determined normal earnings as of the end of the base period, compute normal earnings for the entire base period based on normal conditions for the entire base period.

Under requirement (1) stated at the beginning of this opinion we held that petitioner had established that the determination under (a) above was in the negative. Petitioner contends that the proposed determination of the above amount of $156,456.23 is a step in the determination under (b). For reasons which will become apparent later in this opinion, petitioner continues its proposed determinations under (c) upon a calendar year basis, after which both (b) and (c) are converted to a fiscal year basis.

The bulletin, part V, subpart II (C) (4), page 109, provides as follows:

Techniques of reconstructing earnings for the entire base period will depend upon the manner in which the taxpayer's normal competitive position in its industry has been established. (See Part V, Subpart II (B) (2) (c) for the discussion of the two approaches that may be taken in making this determination.)

* * * * * * *

(b) In those cases where normal operating conditions for the taxpayer are determined to have been such that the use of the second approach is proper, two general techniques of reconstruction for the entire base period are available. In these cases, the portion of the demand existing throughout the base period which the taxpayer should be considered as having supplied will be based upon that portion which the taxpayer supplied actually or constructively, as of the close of the base period.

(i) The first technique, which may be regarded as a shortcut for the second, would ignore a separate and detailed reconstruction of sales, costs, or expenses for the portion of the base period prior to the period for which it is determined that the taxpayer had actually or constructively reached the earning level it would have reached with a 2-year earlier experience. * * *

Having arrived at normal earnings for the last year of the base period, the first technique would require only that a relationship be established between earnings for that year and earnings for the earlier years of the base period. The need for the application of this ratio in reconstructing earnings for the entire base period arises from the fact that business conditions in the taxpayer's industry during the last base period year may have been better or worse than average base period conditions for that industry.

To apply this technique, an index of earnings may first be constructed for the entire base period using the last year of such period as 100 per cent, based either upon the earnings for each year of other representative activities of the taxpayer or of representative members of the taxpayer's industry. * * *

If there are no figures available for the industry or for comparable concerns, the most general business profits index, i. e., the earnings of all corporations, might be used. However, if the taxpayer's business is of a local character, or if the products or services sold have a particular geographical distribution, the general business index might be localized to fit the taxpayer through the use of some local index of business profits.

If the taxpayer is a member of an industry which is in its initial development stage during the base period, use of the industry index may not be appropriate. The presence of development means that the index contains initial growth elements in addition to normal fluctuations. In such cases, indexes of similar industries or the general business profits index might serve as the instrument by which the 1939 position of the taxpayer could be adjusted to average base period conditions.

After obtaining this index for each base period year (1939 being 100), it is applied to the reconstructed earnings for the last year of the base period; that is, the last year reconstructed earnings are multiplied successively, by the indexes for the other years, and the result divided by 100 (since the index is a percentage). The result is reconstructed earnings for each year of the base period.

On January 10, 1945, the Commissioner issued Mimeograph 5807, which was published in the Internal Revenue Bulletin for January 25, 1945. The title of this mimeograph was "Statistics as to corporate profits, years 1918–1939, for use in consideration of applications under section 722 of the Code." Petitioner has taken from this mimeograph the following indexes from column 5 of table I for the years 1936 to 1939, inclusive, as representing the proper indexes to be used. They are as follows:

```
1936_____ 127. 3
1937_____ 128. 3
1938_____  46. 8
1939_____ 131. 3
```

It is a simple matter to convert these indexes so that the index for 1939 will be 100 per cent. This is done by dividing each index by 131.3. The index thus obtained for each year is as follows:

```
1936_____  96. 9%
1937_____  97. 7%
1938_____  35. 6%
1939_____ 100. 0%
```

As stated above, the bulletin provides that:

After obtaining this index for each base period year (1939 being 100), it is applied to the reconstructed earnings for the last year of the base period; that is, the last year reconstructed earnings are multiplied successively, by the indexes for the other years, and the result divided by 100 (since the index is a percentage). The result is reconstructed earnings for each year of the base period.

Petitioner then multiplied the above amount of $156,456.23 by the index for each year in arriving at the proposed reconstructed earnings for each of the calendar years 1936 to 1939, as follows (NOTE: 97.7 per cent of $156,456.23 is $152,857.74, instead of $151,857.74 as computed by petitioner for 1937):

```
1936_____ $151, 606. 09
1937_____  151, 857. 74
1938_____   55, 698. 42
1939_____  156, 456. 23
```

The bulletin, part VIII (C), page 147, provides with respect to "Taxpayers with base period ending after December 31, 1939" in part, as follows:

### (1) GENERAL RULE

As a means of measuring the relief to which the taxpayer is entitled, section 722 provides for the determination of a constructive average base period net income to be used "in lieu of the average base period net income otherwise determined" under Subchapter E of Chapter 2 of the Internal Revenue Code. Many taxpayers claiming relief under section 722 have base periods ending after December 31, 1939. Section 722 (a), however, prohibits any consideration of events or conditions occurring or existing after December 31, 1939, in determining constructive average base period net income.

In making such determination, there is no authorization in section 722 for changing the taxpayer's statutory base period determined under the provisions of section 713 (b) (1). Although in some cases, notably under section 722 (b) (3), it may be necessary to determine the constructive average base period net income by reference to the income of some other period or periods in the taxpayer's history, the amount so determined is nevertheless a substitute for the earnings during the statutory base period. Any period after December 31, 1939, is considered unacceptable as a measure of normal earnings.

Since actual earnings for any portion of the base period after December 31, 1939, cannot enter into the computation of the constructive average base period net income, since income for the entire actual base period must be determined, and since the actual statutory base period cannot be changed to a base period ending on December 31, 1939, the following rule is required: In any construction of average base period net income for a base period ending after December 31, 1939, it is necessary to reconstruct the portion of the base period after December 31, 1939.

In applying this general rule petitioner converted the above reconstructed earnings for each of the calendar years 1936 to 1939 into four fiscal years ended June 30, 1940, in the following manner. In arriving at the reconstructed earnings for the fiscal year ended June 30, 1937, it took one-half of the earnings for the calendar year 1936 and added thereto one-half of the earnings for the calendar year 1937. It arrived at the reconstructed earnings for the fiscal years ended June 30, 1938 and 1939, in a similar manner. In arriving at the reconstructed earnings for the fiscal year ended June 30, 1940, it was necessary under the last sentence of the above general rule "to reconstruct the portion of the base period after December 31, 1939." Since petitioner could give no consideration to events or conditions occurring or existing after December 31, 1939, it assumed that its earnings for the last half of its fiscal year ended June 30, 1940, would be equal to those of the first half. The amounts thus proposed by petitioner as representing its reconstructed net operating earnings for the base period years are as follows:

| | |
|---|---|
| Fiscal year ended June 30, 1937 | $151,731.91 |
| Fiscal year ended June 30, 1938 | 103,778.08 |
| Fiscal year ended June 30, 1939 | 106,077.32 |
| Fiscal year ended June 30, 1940 | 156,456.23 |

Petitioner then adjusted the above reconstructed net operating earnings for the "other income" and "other deductions" stated in its claim and arrived at a reconstructed taxable net income for each of the fiscal years in the base period, as follows (NOTE: Petitioner's claim states the donations for the fiscal year ended June 30, 1937, to be $46 instead of $146. Errors of subtraction were made by petitioner in each of the columns.) :

|  | Year ended 6–30–1937 | Year ended 6–30–1938 | Year ended 6–30–1939 | Year ended 6–30–1940 |
|---|---|---|---|---|
| Reconstructed operating net earnings | $151,731.91 | $103,778.08 | $106,077.32 | $156,456.23 |
| Other income: |  |  |  |  |
| Gain or (loss) noncapital assets | (231.01) |  | 13,614.96 | 989.66 |
| Interest income |  |  | 3,624.02 |  |
| Total | 151,500.90 | 103,778.08 | 123,316.30 | 157,445.89 |
| Other deductions: |  |  |  |  |
| Donations | 146.00 | 39.15 |  | 79.42 |
| State income taxes |  |  | 9.51 | 57.83 |
| Interest expense | 4,656.52 | 4,656.52 | 4,656.52 | 4,656.52 |
| Reconstructed taxable net income | 147,014.40 | 99,043.26 | 118,640.76 | 152,514.87 |

Petitioner then takes a general average of the aggregate of the above mentioned reconstructed taxable net income and arrives at the amount of $129,303.32, which amount petitioner contends it has established as the "fair and just amount representing normal earnings to be used as a constructive average base period net income" for each of the fiscal years ended June 30, 1941, 1942, and 1943.

Section 30.722–2(b) of Regulations 109, as amended by Treasury Decisions 5264 and 5415, *supra*, and section 35.722–2(b) of Regulations 112, as amended by T. D. 5415, *supra*, provide that:

\* \* \* No single test or standard of universal application can be prescribed pursuant to which every taxpayer must establish the fair and just amount representing normal earnings to be used as its constructive average base period net income. However, the following principles and rules must be observed in every case in which a constructive average base period net income is determined.

The regulations, as amended, then set out 10 rules which under the regulations "must be observed in every case \* \* \*." Rules (1), (3), and (10) are particularly applicable here. Rule (1) provides in part that in the determination of the constructive average base period net income a taxpayer is not entitled to use the rules provided in section 713(f). In his denial of petitioner's application for relief under section 722, the Commissioner determined petitioner's actual average base period net income under section 713(f), but petitioner is not contending in this proceeding that its constructive average base period net income should be so determined. Rule (3) provides in part:

(3) Except as otherwise provided, the constructive average base period net income shall be computed with regard to the principles in section 711 (b) \* \* \*.

Rule (10) provides in part:

\* \* \* If the last base period year of the taxpayer ends after December 31, 1939, normal earnings attributable to that portion of the last base period year occurring after that date shall be based upon the normal operations and normal earning capacity which the taxpayer as of December 31, 1939, could reasonably have expected to reach in the remaining portion of such year. If the base period ends after that date, the last day in the base period as of which events or conditions may be regarded in making such determination shall be taken to be December 31, 1939, despite the fact that normal earnings are to be determined for the entire base period.

As previously shown herein, petitioner contends that the amount of $129,303.32 has been established as the "fair and just amount representing normal earnings to be used as a constructive average base period net income" for all three taxable years. In so contending petitioner has overlooked rule (3) of the above mentioned regulations in that it has failed to make the additional adjustment for income taxes required by section 711(b) (1) (A). This adjustment, however, is required only in arriving at the constructive average base period net income for the fiscal year ended June 30, 1941, as section 711(b) (1) (A) has been repealed with respect to taxable years beginning after December 31, 1940. No such adjustment is required for the fiscal years ended June 30, 1942 and 1943. Since petitioner has not shown what the income taxes would have been on its reconstructed taxable net income for each of the fiscal years in the base period, the respondent contends that such failure on the part of petitioner is fatal to the granting of any relief for the fiscal year ended June 30, 1941.

We think, however, that such a showing is a matter of mathematical calculation which may be made in the recomputation under Rule 50. As will presently appear, it would have been useless for petitioner to have shown what such income taxes would have been, for the reason that in our opinion petitioner's proposed reconstructed taxable net income for each of the fiscal years in the base period is too high, and, therefore, an entirely new computation of income taxes on such revised reconstructed taxable net income for each of the fiscal years in the base period becomes necessary. We think the method proposed by petitioner reasonably arrives at the fair and just amount referred to in section 722 (a), except for the factor of 225 per cent used in arriving at the amount of $156,456.23, and except for the adjustment under section 711 (b) (1) (A) for the fiscal year ended June 30, 1941. We think that, on the basis of all the evidence introduced and after giving each factor careful weight as best we can, petitioner would have reached, by the end of the base period, an earning level of 50 per cent greater than it did reach if it had made the changes in the character of its business two years before it did. We so hold. Therefore, in the application of the two-year push-back rule provided

by the statute, we think a factor of 150 per cent should be used instead of the 225 per cent which petitioner has used in its computation. In arriving at this conclusion it must be remembered that by the end of its base period petitioner was already enjoying a very substantial benefit in improved income from the changes which it had made in 1938 and 1939, which are the basis of its application for relief under section 722. This improved income in the last base period year, which was very substantial, is naturally reflected in any computation of petitioner's constructive average base period net income under the applicable statute and regulations. Therefore, under all the evidence, we do not think a higher figure of increase is justified than that which we have found above. We, therefore, determine and hold that petitioner has established under 722 (a) that it is entitled to have its excess profits tax for the fiscal years ended June 30, 1942 and 1943, determined by using a constructive average base period net income for those years of $86,292.17 [2] instead of the actual average base period net income of $75,324.52 as determined by the respondent.

As to the fiscal year ended June 30, 1941, we have found that petitioner's reconstructed taxable net income for each of the fiscal years in the base period was $96,554.41, $64,823.05, $83,291.17 and $100,500.04, respectively. These amounts will be adjusted downward for income taxes as required by section 711 (b) (1) (A), and after that additional adjustment is made a general average will be taken of the balance. The result thus obtained will be the constructive average base period net income for the fiscal year ended June 30, 1941, to be used in determining petitioner's excess profits tax liability for that year, instead of the actual average base period net income of $61,292.49 determined by the respondent.

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*

---

[2] Calendar year 1939 operating net income of $69,536.10 multiplied by 150% equals $104,304.15.

| | |
|---|---|
| 96.9% of $104,304.15 equals | $101,070.72 |
| 97.7% of $104,304.15 equals | 101,905.15 |
| 35.6% of $104,304.15 equals | 37,132.28 |
| 100.0% of $104,304.15 equals | 104,304.15 |
| Fiscal year ended June 30, 1937 | 101,487.94 |
| Fiscal year ended June 30, 1938 | 69,518.72 |
| Fiscal year ended June 30, 1939 | 70,718.22 |
| Fiscal year ended June 30, 1940 | 104,304.15 |

| Year ended 6-30-1937 | Year ended 6-30-1938 | Year ended 6-30-1939 | Year ended 6-30-1940 |
|---|---|---|---|
| $101,487.94 | $69,518.72 | $70,718.22 | $104,304.15 |
| (231.01) | | 13,614.96 | 989.66 |
| | | 3,624.02 | |
| (46.00) | (39.15) | | (79.42) |
| | | (9.51) | (57.83) |
| (4,656.52) | (4,656.52) | (4,656.52) | (4,656.52) |
| 96,554.41 | 64,823.05 | 83,291.17 | 100,500.04 |

The total of the amounts for the 4 years is $345,168.67, which, divided by 4, gives an average of $86,292.17.