DYER ENGINEERS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 10385.   Promulgated June 29, 1948.

*Edwin W. Brouse, Esq.*, for the petitioner.
*Lawrence R. Bloomenthal, Esq.*, for the respondent.

OPINION.

VAN FOSSAN, *Judge*: The single issue is whether or not the petitioner is entitled to relief for the taxable years under the provisions of sec-

tion 722 of the Internal Revenue Code, as amended. It predicates its claim to relief on subsections (a), (b) (2), and (b) (5).[1]

The purpose and plan of section 722 were discussed at length in *Monarch Cap Screw & Manufacturing Co.*, 5 T. C. 1220, and subsequent cases, and need not be repeated here. It is sufficient to emphasize the fact that the section is a relief measure, calculated to help those taxpayers that can bring themselves within the scope of its provisions. The burden so to do is, of course, on them.

The facts in the case at bar are comparatively simple. The petitioner contends and has proved that during its base period of 1936 to 1939, inclusive, labor was vigorously antagonistic to the introduction and maintenance of the Dyer wage incentive system in manufacturing plants. At the same time management resisted the inroads that labor was making in the control and operation of the plants and consequently was hostile to labor. It is essential to the successful application and operation of the system that management and labor be harmoniously cooperative.

The Dyer wage incentive system is neither complex nor hard to understand and to apply. Briefly, it rewards the worker for his

---

[1] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, except that, in the cases described in the last sentence of section 722 (b) (4) and in section 722 (c), regard shall be had to the change in the character of the business under section 722 (b) (4) or the nature of the taxpayer and the character of its business under section 722 (c) to the extent necessary to establish the normal earning to be used as the constructive average base period net income.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

(1) in one or more taxable years in the base period normal production, output, or operation was interrupted or diminished because of the occurrence, either immediately prior to, or during the base period, of events unusual and peculiar in the experience of such taxpayer,

(2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary, economic events unusual in the case of such industry,

\* \* \* \* \* \* \*

(5) of any other factor affecting the taxpayer's business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period and the application of this section to the taxpayer would not be inconsistent with the principles underlying the provisions of this subsection, and with the conditions and limitations enumerated therein.

efforts in producing more than the average or normal amount of output—hence the pertinence of the word "incentive." Excepting the years 1934 and 1935, and the base period of 1936 to 1939, inclusive, the petitioner had, throughout the years, enjoyed a consistently satisfactory net income, giving due regard to periods of business depression. By reason of the altered attitude of labor toward its employers and toward the use of the Dyer system during its base period and for two years prior thereto, the petitioner's income was reduced drastically. In fact, for the years 1936, 1938, and 1939 the petitioner suffered an operating loss. Looking at petitioner's entire prior history, however, it seems at once apparent that the base years were not normal. Thus it is that at the first glance the facts in this case appear to bring the petitioner precisely within the scope and intendment of the statute The respondent undertakes to controvert this conclusion on several grounds.

The respondent first asserts that the enactment of legislation giving labor a more prominent position in determining the rates and methods of fixing wages did not constitute a temporary economic circumstance unusual in the experience of the petitioner. We agree that the mere enactment of legislation in itself produced no event unusual and peculiar in the petitioner's experience. It was the reaction of labor in the premises that brought about the changed condition. The respondent confuses the legislation itself with labor's immediate reaction to its own newly created position in the economic status of the Nation.

It was not the passage of the National Industrial Recovery Act and the Wagner Act that interrupted and diminished the petitioner's normal output. The Wagner Act is still law. But, since 1940 management and labor have adjusted themselves thereto and have gradually reassumed a cooperative attitude toward the establishment and maintenance of industrial programs such as petitioner's incentive plan. The system, if sympathetically received and properly installed and operated, benefited labor and management alike even under new conditions, as both came to realize later.

The respondent next argues that, "since union approval of wage rates was necessary, unions in reality were competitors of petitioner in setting wage standards," and cites *Fish Net & Twine Co.*, 8 T. C. 96, and *Lamar Creamery Co.*, 8 T. C. 928, in support of the principle that competition is not an unusual, peculiar, or temporary event in business experience. We can see no element of competition between the petitioner and labor in any respect. It was a matter of complete indifference to the petitioner what wage the manufacturer paid his workers. That was a question that had to be settled by management and labor. After the wage rate was fixed, management, labor, and the petitioner collaborated in determining a standard production unit

and applied that rate to it. Therefore, we may disregard the respondent's argument based on the theory of competition between labor and the petitioner. As a consequence, the cited cases are not in point in the instant case.

The respondent further argues that the petitioner had dealt with management alone in introducing its plan and that at December 31, 1939, it had no assurance that labor would ever agree to the use of the Dyer plan. We do not find this argument supported by the record. On the contrary, in its earlier experience we note that the petitioner received complete cooperation of both management and labor upon the adoption and installation of its system. Later, when labor assumed its attitude of antagonism and hostility, the petitioner "did educational work" to convince labor leaders that their position was detrimental to the best interests of the workers themselves. The fruits of the petitioner's labor became evident in 1940 and thereafter, so that most classes of labor which have had experience with it are now friendly to the Dyer plan.

The respondent next states that no event or condition occurring or existing after December 31, 1939, should be considered in determining the adequacy of the average base period net income as a standard of normal earnings.

We agree with this contention and we have not considered post base period earnings in establishing what we believe to be petitioner's proper constructive average base period net income. In *East Texas Motor Freight Lines*, 7 T. C. 579, we said, among other things:

Under the statute petitioner must establish (1) that the tax computed without the benefit of section 722 results in an excessive and discriminatory tax and (2) a fair and just amount representing normal earnings to be used as a constructive average base period net income. * * * In determining (2) *no regard shall be had to events or conditions affecting petitioner, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939*, with certain exceptions not material here. [Emphasis supplied.]

In our finding that the sum of $30,000 is the fair and just amount representing the normal earnings of the petitioner to be used as a constructive average base period net income for the purpose of computing its excess profits taxes for the taxable years, we have observed the rule of the statute as referred to above in *East Texas Motor Freight Lines, supra.*

These cases must be decided on the record made. Under the facts before us, the petitioner has demonstrated under subsection (b) (2) that it is entitled to relief. No specific "factor" not comprehended in these two sections has been shown to exist and, therefore, subsection (b) (5) does not apply.

Finally, the respondent contends that the petitioner has not established the fair and just amount representing normal earnings, to be

used as a constructive average base period net income. The petitioner submitted evidence for the purpose of showing that such constructive average base period net income was $43,844.62. It also submitted much other pertinent and helpful evidence. Though we have not accepted petitioner's figure, we find ample proof in support of the figure found by us. Giving due weight to all the facts and circumstances developed in the record and properly to be considered under the statute, we consider the sum of $30,000 to be such fair and just amount, and we so hold.

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*