OPINION. Johnson, Judge: The question presented is whether petitioner is entitled to relief from excess profits tax for the years before us under the provisions of section 722 (b) (4). Under the statute petitioner must establish (1) that the tax computed without the benefit of section 722 results in an excessive and discriminatory tax, and (2) a fair and just amount representing normal earnings to be used as a constructive average base period net income. Cf. East Texas Motor Freight Lines, 7 T. C. 579. In determining (2) above, no regard shall be had to events or conditions affecting petitioner, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939. We shall first consider whether petitioner has established (1) above. Section 722 (b) (4), in so far as material to the instant case, provides that the excess profits tax imposed shall be considered excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713: (b) * * * if its average base period net income is an inadequate standard of normal earnings because— [[Image here]] (4) the taxpayer, * * * during * * * the base period, * * * changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business * * *. It further provides that “the term ‘change in the character of the business’ includes * * * a difference in the capacity for production or operation.” The parties agree that the petitioner is entitled to use the excess profits credit on income pursuant to section 713. Petitioner contends that the erection of a new antenna during the base period produced an increase in capacity for production which directly resulted in an increase in its income from advertising so as to bring it within the scope and intent of section 722 (b) (4). A further contention of the petitioner is that the modernization of its studio facilities, and the installation of new recording equipment should be considered as changes under the statute. Petitioner did not press the latter contention. It appears from the modicum of evidence that these changes wer-e repairs such as cleaning and painting, with the addition of some modern transcribing equipment. Without further discussion, these changes are found not to be within the scope of section 722. It is respondent’s contention with regard to the installation of the new antenna in 1937 that such an installation was simply a type of technical development which was routine with radio broadcasting stations, and therefore did not constitute a change in the character of petitioner’s business within the meaning of section 722 (b) (4). Respondent further contends that the erection of the new antenna did not directly result in an increase in petitioner’s advertising income. If petitioner had increased its power, which it could not do under Federal Communications Commission regulations, then the following section of Regulations 112 would be applicable: (d) Commencement or change in character op business.— ******* (3) * * * A radio broadcasting station increased its power during the base period, necessitating changes and expansion of the physical property of the station, and thus enlarged the. area it served. The station was thereby enabled to increase its volume of advertising and advertising rates. Such radio station is deemed to have effected a change in its capacity for production or operation. * * * [Section 35.722-3(d) (3), Regulations 112]. The petitioner “enlarged the area it served.” Prior to the erection of the new antenna in 1937, tests indicated that while 50,000 watts of input power were being generated into the old antenna, petitioner’s effective radiating power, that is, the power which listeners can hear, was only about 20,000 watts. The antenna was operating on an efficiency of only 40 per cent. Tests on the new antenna indicated an efficiency of approximately 100 per cent. This was equal to an increase in effective radiating power of 150 per cent. Therefore, while petitioner had no actual increase in capacity to generate power, it has tripled its effective power by the use of the new antenna. The increase in effective power provided an increase in nighttime coverage from 12,700 square miles to 45,750 square miles and doubled the population served. A similar improvement was also shown for daytime coverage. To qualify for relief petitioner must show that the erection of the new antenna was a, change of substantial, of a permanent' or lasting nature, and not of a routine character. See section 35.722-3 (d), Regulations 112. We think that the record clearly indicates that petitioner made a substantial change. On a small plot of land purchased especially for the installation, petitioner erected an entirely new antenna and installed a ground webbing to go with the antenna. Petitioner was a pioneer when it erected this new antenna; it was the first such antenna in Texas, or even in the Southwest. It is not disputed that the new antenna employed recent technological improvements, but the use of technical knowledge for a part does not necessarily designate the whole as a mere technological improvement of a routine character. Prior to the erection of the new antenna petitioner had to secure the authorization of the Federal Communications Commission and the Bureau of Air Commerce. This tends to further support petitioner’s contention that the change was of a substantial character. While no single factor itself proves that the change was of a major and substantial character, when we consider the testimony, the tests and the plans prior to the erection, the antenna itself, and the resulting increase in coverage, there is no doubt in our minds that the change was substantial, and of a permanent and lasting nature. Pursuant to its agreement with NBC wherein the petitioner could request a survey of its coverage after a major improvement was made, petitioner requested such a survey to determine if a rate increase was justified. In January 1939 the survey was completed. A month later, because of the increased coverage as shown by the survey, petitioner was granted an increase in its unit rate per hour. However, because of a trade practice, the increase was not made effective until October 1939. Respondent contends, since there was too great a time lag between the erection date and the date of the rate change, that the erection of the new antenna was not responsible for the rate increase. A vice president of NBC explained the cause for this time lag as follows: It takes a considerable length of time for listeners to change their habits. They become accustomed to passing over a certain spot on the dial when inferior reception has been received. Gradually they begin to listen to that station and eventually be counted as part of the circulation. It takes anywhere from six months to a year to accomplish that. Other evidence indicates that because of the competition and trade practice WOAI could not raise its local rates for advertising until such time as it received a rate increase for network time. Because the petitioner has shown that the erection of the new antenna resulted in improved coverage, and that the rate increase was directly attributable to the improved coverage, we find that a higher level of earnings is directly attributable to the erection of the new antenna. Petitioner has shown “a change in the character of the business” within the contemplation of section 722(b) (4). Generally, business experiences a time lag between the time that new operations are commenced, reflecting either the starting of a new business or of a business essentially different in character from an old business, and the attainment of a normal earning level. If all or a portion of this time lag occurs during the base period, the earnings during such period can not be said to represent normal average earnings. Section 35.722-3 (d), Regulations 1Í2. Petitioner received a rate increase in October 1939 and a month later increased its local and network rates so as to correspond to the network increase. However, under the trade, rate policy these increases did not immediately improve petitioner’s income. Under this policy a continuing advertiser was permitted to continue its broadcasts at the old rates for a period of 1 year beyond the date when the new rates became effective. Since the full effect of the rate increase would not be determined until some 12 months after the increase, an increase at the end of the base period could not possibly reflect the normal operations for the entire base period. A provision of section 722 (b) (4) is as follows: * * * If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached' if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. * * * In light of this section of the Code and the evidence that it takes 12 months before the new rates can be applied to all advertisers, we think it necessarily follows that as a matter of fact petitioner’s business did not reach, by the end of the base period, the earning level which it would have reached if petitioner had made the change in character 2 years before it did. On the entire record, we hold that petitioner has established that the tax computed without benefit of section 722 results in an excessive and discriminatory tax, and that its average base period net income is an inadequate standard of normal earnings. In considering (2) above, what is a fair and just amount representing normal earnings to be used as the constructive average base period net income, we must evaluate an estimate of what earnings would have been under assumed circumstances. An absolute constructive net income is not available and is not expected. Petitioner used the actual radio time sold in December 1939 as the basis of its reconstruction. Knowing the ratio of its income in December to the whole year, petitioner computed the yearly income. The 1939 yearly income was extended for the base period by the use of index numbers which the petitioner compiled. We do not accept these index numbers. The parties have stipulated statistical data from which normal earnings for 1939 may be reconstructed. Some such reconstruction, subject to error as it probably is, must be used and has been used by the Court in arriving at a “fair and just amount to be used as constructive average base period net income.” Cf. Victory Glass, Inc., 17 T. C. 381; Lamar Creamery Co., 8 T. C. 928. Reviewed by the Special Division. Decisions will be entered under Bule 50.