GULF COAST BROADCASTING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 30834. Filed September 27, 1955.

---

*Joyce Cox, Esq.*, for the petitioner.
*Allen T. Akin, Esq.*, for the respondent.

1098

BLACK, *Judge:* Petitioner contends that it is entitled to excess profits tax relief, under section 722 (b) (4) or (b) (5), for its fiscal years ended November 30, 1943 through 1946. The applicable provisions of section 722 appear in the margin.[1] Applicable also are various provisions of Regulations 112 and of the Treasury Department's Bulletin on Section 722, Excess Profits Tax Relief (hereinafter referred to as the Bulletin).

To sustain its claim for relief under the statute petitioner must establish (1) that the tax computed without benefit of section 722 is excessive and discriminatory and (2) a fair and just amount representing normal earnings to be used as a CABPNI. See *East Texas Motor Freight Lines,* 7 T. C. 579.

Petitioner was entitled to, and did, compute its average base period net income under the section 713 (f) "growth formula," arriving at $30,784.84 (its actual net income for 1939) as the amount thereof. It

---

[1] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, except that in the cases described in the last sentence of section 722 (b) (4) * * *, regard shall be had to the change in the character of the business under section 722 (b) (4) * * * to the extent necessary to establish the normal earnings to be used as the constructive average base period net income.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

* * * * * * *

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purposes of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, * * * Any change in the capacity for production or operation of the business consummated during any taxable year ending after December 31, 1939, as a result of a course of action to which the taxpayer was committed prior to January 1, 1940, * * * shall be deemed to be a change on December 31, 1939, in the character of the business, or

(5) of any other factor affecting the taxpayer's business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period and the application of this section to the taxpayer would not be inconsistent with the principles underlying the provisions of this subsection, and with the conditions and limitations enumerated therein.

seeks to establish that, as a result of both base period commencement and change in character of its business, it qualifies for relief under either subsection (b) (4) or (b) (5) of section 722. However, since those factors (commencement and change) are ones to which subsection (b) (4) is specifically directed and petitioner has not called our attention to "any other factor," its claim under (b) (5) is not sustainable and need not be further considered by us. *Clermont Groves, Inc.*, 17 T. C. 1616. We need only concern ourselves, therefore, with the determination of whether petitioner qualifies for relief under section 722 (b) (4) and, if so, the extent of such relief.

Insofar as applicable to this case, section 722 (b) (4) provides that petitioner's excess profits taxes for the years in issue, computed without benefit of 722, will be considered "excessive and discriminatory" if petitioner shows that its average base period net income of $30,784.84 "is an inadequate standard of normal earnings because" petitioner, "during * * * the base period, commenced business or changed the character of the business and the [$30,784.84] * * * does not reflect the normal operation for the entire base period of the business." A change in character of the business includes "a difference in the capacity for production or operation," and if a change of that type was consummated in a taxable year ending after December 31, 1939 (rather than during the base period), but resulted from "a course of action to which the taxpayer was committed prior to January 1, 1940," it is deemed, under the commitment rule, to be a change on December 31, 1939. Further, (b) (4) contains the so-called push-back rule providing that if petitioner's business "did not reach, by the end of the base period, the earning level it would have reached if * * * [petitioner] had commenced business or made the change in * * * character * * * two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time." [2]

It is admitted by respondent that petitioner commenced business on April 1, 1937, which was during the base period. It is also admitted that, as a result of a course of action to which it was committed prior to January 1, 1940 (i e., filing of application with F. C. C.), petitioner's operational capacity was changed on July 22, 1941, from transmission at 500 watts to transmission at 1000 watts, day and night, and that such change is properly deemed to have occurred on December 31, 1939. See Regs. 112, sec. 35.722–3 (d) (3), (5). Petitioner, therefore, possesses two of the (b) (4) qualifying factors, and we so hold.

---

[2] As regards the push-back rule, the Bulletin points out, at Part V (II) (B) (3) (a), that "it is not theoretically possible to determine that the taxpayer has reached by the end of the base period the level of normal earnings it would have reached under the push-back provision without making a computation under that provision." Therefore, in analyzing whether petitioner has established its right to relief the push-back rule will be applied by us.

Applying the push-back rule to those two factors our analysis proceeds on the assumption that petitioner began business on April 1, 1935, and changed from 500- to 1000-watt operation on December 31, 1937. See Bulletin, Part V (II) (F) (3). We also assume that it entered into its affiliation contract with NBC on June 23, 1935, almost contemporaneously with the commencement of its business. The first question then is whether, in the framework of economic conditions as they actually existed during the base period, *Southern California Edison Co.*, 19 T. C. 935, petitioner would as a result of the above assumptions have realized net income in 1939 greater than its actual net income of $30,784.84 for that year. If the answer is in the negative, then it is clear that any CABPNI would be less than petitioner's actual average base period net income—which was determined under the "growth formula" as that same $30,784.84. See *Homer Laughlin China Co.*, 7 T. C. 1325. This is so because both parties agree that the CABPNI must be computed by multiplying petitioner's reconstructed earnings for 1939 by a percentage, representing the average of index numbers of net earnings for the 4 base period years (1939 equaling 100), see *East Texas Motor Freight Lines, supra*, and, although there is a difference of opinion between the parties as to the proper indices to use, the average of either set is less than 100.

Following a careful analysis of the evidence, including many detailed exhibits concerning petitioner's financial history and the financial history of other broadcasting stations, we have concluded that, after operation of the commitment and push-back rules, petitioner would have realized net income in 1939 no greater than its actual $30,784.84 net income for that year.

As has already been stated petitioner contends for a CABPNI of either (1) an amount for each taxable year in issue equal to its excess profits net income for such year, (2) $77,281, or (3) such other amount as this Court may determine.

By a reference to our Findings of Fact it will be seen that petitioner's net income in 1939 was $30,784.84, which was the highest it had attained in any year since it began business in 1937. Thus, it will be seen that the CABPNI of $77,281 for which petitioner contends is 2½ times as much as its 1939 net income. The reconstruction by which petitioner reaches the conclusion that its CABPNI should be $77,281 is shown in our Findings of Fact. That reconstruction assumes that by the application of the 2-year push-back rule petitioner's gross income in 1939 would have been $230,792. By a reference to the table entitled "Summary of Petitioner's Revenue" in our Findings of Fact, it will be seen that petitioner's gross revenue from all sources in 1939 was only $98,957.51. Therefore, it seems to us that petitioner's contention for assumed gross revenue in 1939 of $230,792 and

net income of $77,281 by application of the push-back rule is altogether unrealistic and is not supported by the facts of record. Also of considerable significance, we think, in negativing petitioner's contention that by the end of 1939 it had not reached its normal earning level when it had net income of $30,784.84, is that in the following year, 1940, its net income was $24,752.67. In 1941, petitioner changed to a fiscal year basis ending November 30, 1941, and its net income for that 11-month fiscal year was $18,081.10. Therefore, it seems to us that petitioner's reconstruction of a CABPNI of $77,281 is not supported by the facts. Furthermore, we are unable to find in the record any support for a CABPNI of an amount lesser than $77,281 but greater than the $30,784.84 which petitioner has received under section 713 (f). It would, of course, be permissible to grant petitioner a CABPNI of a lesser amount than that contained in its application for relief and its petition if the facts warranted it, but, as already stated, we do not think the facts warrant our finding of a CABPNI large enough to afford petitioner any relief.

It is petitioner's primary contention that, after application of the commitment and push-back rules, additional revenues would have been realized from NBC in 1939 which, in turn, would have stimulated national "spot" revenue in the form of time purchased adjacent to the NBC programs. But the record does not indicate that appreciable added revenue would have been realized from NBC had petitioner commenced business in 1935 and begun transmitting at 1000 watts on December 31, 1937. It is true that Corpus Christi was a growing city in a growing section of the country. Nevertheless, Smith, petitioner's manager, testified that the advertising agencies and sponsors who bought NBC network time based their decisions to buy primarily upon population figures and that, during the entire base period, the only such figures available were those of the 1930 census. Therefore, even though Corpus Christi was growing, the time buyers could not be impressed with that fact since they resorted to the unfavorable 1930 census reports. Smith's testimony is borne out by NBC's reluctance to have its representatives "waste" effort in attempts to sell network time on KRIS, the terms of the NBC contract requiring petitioner to guarantee transmission line charges to Corpus Christi (Rider No. 1), and the fact that, as late as October 1, 1939, NBC reduced the KRIS rate from $120 to $100 per full evening hour. It is also of importance that petitioner's gross receipts from NBC for 1939 were actually less than those for 1938 and, as a result, its transmission line payments to NBC exceeded its receipts from that network by a greater amount in 1939 than in 1938.

Consequently, considering the temper and criteria of the time buyers during the base period, as we must do, *Southern California Edison Co.,*

*supra*, it does not appear to us that, had petitioner begun operations in 1935 (thereby giving Smith 2 more years in which to promote KRIS), Smith would have been very much more successful in selling network time on KRIS during 1939. This conclusion is strengthened by the fact that revenue from NBC was actually less in 1939 than 1938, even though income of stations generally rose in 1939.

The evidence convinces us that Smith is an able and competent manager of a radio station and he has brought KRIS to success. There seems to be no doubt of that fact. His testimony was to the effect that it takes 8 or 10 years to bring a radio station to its full development. To the same effect was the testimony of James M. Gaines, a former vice president of NBC and undoubtedly a man well informed and experienced in the radio business. On the strength of this testimony, we made a finding in our Findings of Fact that "It was determined that it would take at least eight or ten years to fully develop KRIS."

But the excess profits tax law with which we are here dealing takes no note of any 8- or 10-year development period. It might well be that if petitioner had commenced business 6 or 8 years prior to the time it did in 1937, it would, by the end of 1939, have reached the normal level of earnings for which it contends. But it is the 2-year push-back rule provided in 722 (b) (4) that we must apply here and in applying it we are unable to reach the result for which petitioner contends. We do not think the record supports it.

Petitioner appears to argue, both as an additional qualification for relief under (b) (4) and as a basis for reconstruction of its 1939 income, that it was "committed" prior to January 1, 1940, to become a national outlet and that such "commitment" was realized in the period 1943–1947, when about 80 per cent of its NBC network optional time was purchased by network advertisers and the time adjacent thereto was purchased by national advertisers. Therefore, petitioner contends that under the (b) (4) commitment rule, its 1939 income should be reconstructed on the assumption that 80 per cent of its NBC network optional time, and the adjacencies thereto, were purchased in 1939 by network and national advertisers.

This argument, we think, is unsound. In the first place petitioner's contract with NBC was entered into almost contemporaneously with its commencement of business in 1937 and operations were conducted under the contract during the remainder of the base period. From the start, therefore, petitioner intended to be a national outlet, made the arrangements to become such, and actually entered into operations as such. Consequently, there was no "commitment" to become a national outlet which was not consummated until after December 31, 1939. The case might be different had petitioner entered into its NBC

contract in 1939 with operations beginning thereunder in 1940. See Regs. 112, sec. 35.722-3 (d) (5).

The only question posed by petitioner's argument along this line is whether petitioner, in 1939, could have sold 80 per cent of its NBC network optional time, and the time adjacent thereto, had it commenced business and entered into the NBC contract in 1935, and had it been operating at 1000 watts since December 31, 1937. Earlier in this opinion we, in effect, decided that question in the negative.

In the light of the above we conclude that petitioner has failed to prove that its actual 1939 net income did not reflect the earning level it would have reached had it commenced business in 1935 and begun transmission of 1000 watts on December 31, 1937. Consequently, under the circumstances of this case, petitioner has failed to prove a fair and just amount representing normal earnings (in excess of its average base period net income) to be used as a CABPNI and, therefore, has not shown that its average base period net income is an inadequate standard of normal earnings for the entire base period and that its excess profits taxes for the years in issue are excessive and discriminatory.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*