TRANSIT BUSES, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 27956. Promulgated September 16, 1953.

*Merle H. Miller, Esq.*, and *Wesley A. Dierberger, Esq.*, for the petitioner.

*Lester M. Ponder, Esq.*, and *Lyman G. Friedman, Esq.*, for the respondent.

---

1002

**OPINION.**

TURNER, *Judge:* The parties are in agreement that the petitioner is qualified for relief under the provisions of section 722 (c) (1) of the Internal Revenue Code [1] and, by reason thereof, is "entitled to use the excess profits credit based on income, using the constructive average base period net income determined under subsection (a)." [1]

In its claim for relief, the petitioner contended for a constructive average base period net income of $62,590. In its petition, the amount claimed was $61,195.54, while, on brief, it now argues that $64,268.42

---

[1] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, except that, in cases described in the last sentence of section 722 (b) (4) and in section 722 (c), regard shall be had to the change in the character of the business under section 722 (b) (4) or the nature of the taxpayer and the character of its business under section 722 (c) to the extent necessary to establish the normal earning to be used as the constructive average base period net income.

\* \* \* \* \* \* \*

(c) INVESTED CAPITAL CORPORATIONS, ETC.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer, not entitled to use the excess profits credit based on income pursuant to section 713, if the excess profits credit based on invested capital is an inadequate standard for determining excess profits, because—

(1) the business of the taxpayer is of a class in which intangible assets not includible in invested capital under section 718 make important contributions to income,

\* \* \* \* \* \* \*

In such case for the purposes of this subchapter, such taxpayer shall be considered to be entitled to use the excess profits credit based on income, using the constructive average base period net income determined under subsection (a). \* \* \*

is the fair and just amount to be used as its constructive average base period net income. It is the position of the respondent that the petitioner has failed to show any amount as a fair and just amount representing base period earnings which would result in an excess profits credit equal to that determined and used by him.

The petitioner recognizes that the determination of a constructive average base period net income must be based on an operation of the same type as that actually conducted by it during the taxable years. *Tin Processing Corporation*, 16 T. C. 713. It has been unable to find any business in existence during the base period of the exact type of operation that its business was during the taxable years and, as a consequence, it urges that the base period experience of Ford with the Ford transit bus affords a proper basis upon which to construct what would have been its normal base period earnings if it had been in existence.

One difficulty with that approach is that petitioner has not shown and, so far as appears, does not know what the transit bus earnings of Ford were during the base period. It has shown the number of bus bodies built for Ford by the Union City Body Company during the base period and what the latter received for such bodies. It has also shown the number of buses, both Standard and DSR, sold by Ford in the base period and the price Ford received for the Standard buses. It has not shown what Ford received for the DSR buses, nor the profit, manufacturers' or distributors', realized on either the Standard or DSR buses.

The nearest indication appearing of record of the profit, exclusive of manufacturers' profit on the bus chassis, realized by Ford in the base period related to Standard buses only and was as of August 21, 1939, and following. At that date Ford was paying Union Body $1,852.70 per bus body and was quoting the bus chassis to its bus dealers at $1,450. For the completed bus, body, and chassis, it was quoting to its bus dealers a price of $3,437.50, which, on the body and chassis prices just stated, would indicate a gross profit to it of $134.80 per bus. Where no bus dealer had been appointed, Ford quoted prices to its regular Ford dealers which were considerably higher for both the completed bus and the chassis alone, than the above prices quoted to its regular bus dealers. The facts, however, show no buses sold by Ford in the base period at a price in excess of $3,437.50 per bus.

The petitioner and the respondent are in agreement that for the purposes here the provisions of E. P. C. 35, 1949–1 C. B. 134, are applicable, in that the constructive base period net income of the petitioner should be determined as in the case of a corporation which commenced business on December 31, 1939, and is qualified for relief under section 722 (b) (4) of the Code, and that for the purpose of determining the constructive level of petitioner's earnings at Decem-

ber 31, 1939, the commencement of business may be assumed to have occurred on December 31, 1937. They are also in agreement that if petitioner had commenced business on December 31, 1937, under the same or comparable arrangement with Ford as existed in the taxable years, the buses sold by Ford in 1939 would have been a fair representation of the buses which petitioner would have sold in 1939. From that point on, the determinations by petitioner and respondent of what would have been a fair and just amount representing normal earnings to be used as a constructive average base period net income are quite divergent.

The respondent, on the one hand, computes constructive 1939 gross profits for petitioner by treating the actual sales by Ford in 1939 as the constructive sales of petitioner for that year, and the $134.80 arrived at, as shown above, as the gross profit realized per bus.[2] He then deducts constructive administrative and sales expenses of $63,000, to arrive at constructive 1939 net income, to which he then applies the stipulated average base period index figure of 91.2 to determine constructive average base period net income. Cf. *East Texas Motor Freight Lines*, 7 T. C. 579. The resulting figure indicates no basis for relief beyond that already allowed.

The petitioner, on the other hand, arrives at its claimed constructive average base period net income by first computing separately an amount as constructive net income for each base period year, as was done in *Lamar Creamery Co.*, 8 T. C. 928. Assuming that a fair and proper construction of the number of buses petitioner would have sold in each of the base period years could be made on the facts of record[3] by the method applied in *Lamar Creamery Co.*, we would still not be able to complete the computation of constructive net income for each of the base period years, as was done in that case. In

---

[2] While agreeing with petitioner's requested finding that its gross profit per DSR bus would have been only one-half the profit realized per Standard bus, the respondent, for the purpose of demonstrating his claim that petitioner has failed to prove any amount representing normal base period earnings which would result in an excess profits credit equal to that determined and already allowed by him, has used $134.80 as the gross profit which would have been realized on DSR buses as well as Standard buses.

[3] In any event, the evidence of record would not, in our opinion, justify a determination of the constructive number of bus sales claimed by petitioner. Except for 1936, when Ford actually sold only one Standard bus, the construction contended for shows Standard bus sales in a lesser amount than were actually made by Ford. With respect to DSR buses, however, it seeks a constructive determination of DSR buses sold in the base period from actual sales of 1,044 buses to 1,347. We have been unable to find of record any basis for making any construction of the number of DSR buses which petitioner would have sold in the base period, if it had been in existence, over and above the sales of such buses actually made by Ford. It goes without saying that the requirements of Detroit Street Railway for new buses in each, or all, of the base period years had some limitations. The purchases from Ford were substantial, and if there was any factual basis for reconstructing Ford's actual sales of DSR buses, petitioner could have so shown by procuring and offering proof as to whether or not Detroit Street Railway actually purchased any buses other than those purchased from Ford or had any plan or program for purchasing additional buses in those years.

*Lamar Creamery Co.*, we had proof of unit sales prices and unit costs of ingredients, processing, and operations, with the resulting unit profit for each of the base period years. In the instant case, we have no such proof. Instead, we are asked to accept the flat sum of $300 as the constructive gross profit which would have been realized on each Standard bus which would have been sold in all base period years and the flat sum of $150 as the constructive gross profit which would have been realized on the sale of each DSR bus, and arrive at the constructive net income for each base period year by deducting as administrative and sales costs for each year a flat 39.7 per cent of the constructive gross profit for each year, computed as indicated. Certainly, in the absence of proof, we may not conclude that the gross profit per bus would or could, in reason, have been constant throughout the 4-year period, or that the percentage of gross profit absorbed by administrative and selling expenses per unit would similarly have remained constant, it being noted that the stipulated indexes of wholesale prices of all commodities, durable goods, and motor vehicles for the years 1936 through 1939 and the index for the same years for net profits of all corporations tend to indicate exactly the contrary. It is thus apparent that we are left in the instant case to the use of the general business index figures, as in *East Texas Motor Freight Lines, supra*, since petitioner has failed to supply better or more appropriate data, as in *Lamar Creamery Co., supra*.

Since Ford actually sold 189 Standard buses and 294 DSR buses in 1939, and both parties have agreed that the buses actually sold by Ford in that year are a fair representation of the buses petitioner would have sold in 1939, it is wholly reasonable, we think, to use 189 Standard buses and 294 DSR buses as the buses petitioner would have sold in 1939, for the purpose of arriving at its constructive 1939 income.

As to constructive gross profit from bus sales, the respondent agrees to petitioner's position that its gross profit on DSR buses would have been one-half of its gross profit per Standard bus, but he does not agree to petitioner's claim that its gross profit would have been $300 per Standard bus. The petitioner's claim of the $300 figure is based on the assertion of that figure in the testimony of two of its officers and the statement in a letter dated September 8, 1943, from H. L. Moekle, then secretary of Ford, to the effect that if Ford had had an arrangement with petitioner during the base period similar to that in later years, the agreement, in his opinion, would have been such as to enable petitioner to realize "approximately the same margin of gross profit per unit" as petitioner had realized under the February 1941 agreement.

As to Moekle's statement, the respondent properly points out that such determination of gross profit per bus would, for all practicable purposes, be a determination on the basis of post-December 31, 1939, events, which, under the statute, may not be done. See section 722 (a), *supra*. We find no merit in the argument of petitioner that for the purposes here such reference to its post-December 31, 1939, profits would be for the purpose of determining the nature of the taxpayer and the character of its business. Furthermore, it is to be noted that, although Moekle's testimony was taken by deposition, no effort was made in the course of his examination to obtain from him any amplification of the factual basis for the opinion expressed in his letter of September 8, 1943, or to show what, if any, ante-December 31, 1939, facts or events were taken into account. Also, in the normal course of events, it would have been reasonable for petitioner, in calling Moekle as a witness, to have sought some developments of facts which would have disclosed some information as to the profits Ford had actually realized during the base period on its sales of both Standard and DSR buses. Furthermore, we cannot escape the impression, from the reading of Moekle's deposition, that assuming he had at one time been familiar with the details upon which his ultimate conclusions were based he had made no attempt to refresh himself as to those facts and in his testimony was speaking quite extemporaneously and "off the cuff." [4]

The opinions of Fitzgerald and Adelsperger are little, if any, more impressive. Not only was careful attention given to their testimony at the time of the trial, but it has been re-examined in the light of the proposed findings and briefs of the petitioner, and we are unable to conclude that the testimony in substance represents much, if anything, more than an assertion of the ultimate facts for which the testimony is claimed to be proof. We must have better proof than mere assertion of the claimed ultimate fact. *Arden-Rayshine Co.*, 43 B. T. A. 314. In short, the only supporting detail of any moment for the gross profit claimed, is petitioner's actual experience in post-base period years, and Congress, as we have pointed out, has ruled out a taxpayer's experience in the excess profits years themselves as the basis for determining the extent by which those same profits were excessive.

It is true, as petitioner's counsel has pointed out, that the $134.80 computed as the gross profit per Standard bus, as shown above, was based on the quoted prices for the bus chassis and the completed bus to Ford's bus dealers from and after August 21, 1939, and that it was about that time that the motor was changed from the front of the

---

[4] He had not been in charge of Ford's transit bus division, nor did he have anything to do with the sales of transit buses. Neither did he have supervision of its cost accounting system. In fact, he did not remember just what his position was with Ford during the base period, auditor, assistant secretary, or secretary.

chassis to the rear. It is argued that the manufacturing cost of the chassis was accordingly increased and, for that reason, $134.80 was not reasonably indicative of Ford's gross profit per Standard bus prior to August 21, 1939, when the chassis with the motor at the front was being used. The best evidence as to that, of course, would have been evidence as to what Ford's costs actually were. In lieu thereof, petitioner sought to substitute the speculative guesses or estimates of one of its officers as to the difference in cost to Ford of producing a bus chassis with the motor in front and a bus chassis with the motor in the rear. It was obvious that the witness did not know, even by hearsay, what the cost difference was, but was trying to project himself into the position of the manufacturer and thereby make his estimate or guess, and, after some colloquy, the inquiry was dropped, leaving petitioner to such argument as it felt just and proper on the facts which were known and established.

On the evidence, it is probable, we think, that Ford's cost in manufacturing the bus chassis with the motor to the rear was greater than the cost of manufacturing the chassis with the motor at the front, but that would not indicate that the gross profit to Ford for a Standard bus, prior to the advent of the chassis with the motor to the rear, was any greater than such gross profit thereafter. After the change-over, Ford continued to pay Union Body $1,852.70 per Standard bus body, which price had remained unchanged since March 25, 1938. It increased its price for the completed Standard bus to its bus dealers from $3,137.50 to $3,437.50. It is thus apparent that this added $300 per Standard bus was accounted for in full as increased cost of the new bus chassis, or was in part an increase to Ford in the gross profit per Standard bus over the gross profit it had been realizing theretofore. Certainly we have no reason to conclude that the increase to Ford in the manufacturing cost of the new chassis over the cost of the old was more than the $300 by which the selling price of the completed bus was advanced. We are inclined to the view that the said $300 increase was added to cover the increased cost of the bus chassis, particularly since the respondent makes no claim that the gross profit per Standard bus prior to the increase in price was any less than the above gross profit of $134.80 per bus after the increase.

In light of the above, we think $134.80 per Standard bus, arrived at as previously indicated, provides the best starting point for determining the constructive gross profit the petitioner would have realized on the buses it would have sold in 1939. Ford was paying Union Body $1,852.80 for Standard bus bodies in that year and we have been shown no reason why, in fairness, Union Body should have been expected to make a better price to petitioner, and we do not understand that petitioner claims it would have. Neither do we have

reason to conclude that petitioner would have required bus dealers to pay more per bus than they were paying Ford. We are of the opinion, however, that Ford may well have made petitioner a better price on the bus chassis than the $1,450 price to its bus dealers. Our reason for that view is that, since Ford would not have been distributing and selling the completed buses, it would have been relieved of its cost and financial responsibilities with respect to the building and installation of the bus bodies, and, in addition, it would not have been burdened with the cost attendant upon the distribution and sale of the completed buses. As to such administrative and sales costs, Moekle apparently had made some search and study, his statement being that while Ford did not have a separate breakdown, such cost ranged generally from $1\frac{1}{2}$ to 2 per cent of sales during the base period years. At $1\frac{1}{2}$ per cent, Ford's savings would have been approximately $50 per Standard bus. Since for the future petitioner would have been relieving Ford of such expense, it is reasonable to assume, we think, that Ford would have been willing to make a comparable reduction in the price of its bus chassis to petitioner. Accordingly, we have concluded and found that petitioner's gross profit per Standard bus would have been $185 per bus in 1939, and, in keeping with petitioner's requested finding and respondent's agreement therewith, that the gross profit on DSR buses would have been approximately 50 per cent of the gross profit on Standard buses, we have concluded and found that the gross profit on DSR buses in 1939 would have been $92.50 per bus.

The question as to the constructive administrative and sales costs for petitioner for 1939 is quite difficult and by the very nature of the situation the evidence leaves much to be desired. Both parties have undertaken to construct such costs, item by item, but in many respects the justification offered for the figures advanced is that the one party has stated that the proper amount for a particular item is this, and the other, that it is that.

The petitioner rests its claim that proper constructive administrative and sales costs would have been $39,000, upon the testimony of two of its officers. The respondent relies largely on matter developed in the cross-examination of these witnesses and upon argument made therefrom. While the testimony relied on by petitioner does consist of the expressions of opinions by interested witnesses, and at its best, is highly speculative, it is the testimony of witnesses who, with Geisler now dead, should have been in as favorable position for giving informative opinions as could have been obtained, and though interested witnesses, we feel they were earnestly doing their best in the circumstances. It was the opinion of one of these witnesses that the expenses would have ranged from $35,000 to $40,000 per year. It was the opinion of the other that the amounts would have been ap-

proximately $38,850. These estimates allowed varied amounts for salaries according to the positions they thought would have been filled. They then made allowances for advertising, travel, rent, telephone, and supplies, and $7,500 for "other expenses."

The respondent contends that not only have the individual items mentioned been underestimated, but that proper allowance has not been shown for taxes, interest expense, finance charges, and sales expenses, or for other expenses, such as depreciation, legal and auditing expense, insurance, supplies, and other miscellaneous items. In this manner, the respondent arrives at constructive administrative and sales costs for 1939 of $63,000.

We have carefully considered the testimony of the witnesses mentioned. We have examined and studied the arguments made by both the petitioner and the respondent, and it is our conclusion that a fair and just amount to be used as constructive administrative and sales costs for 1939 is $42,500. Even though we should accept the views of the witnesses as to salaries, we agree with the respondent that the adequacy of the catchall item "other expenses" is not convincing. It was brought out, for instance, that no allowance was made for freight charges. The explanation was that such charges would apply to the bus chassis and would properly have been accounted for as part of the chassis cost. While that may be true as to entry on the petitioner's books of account, we have noted that Ford quoted its prices to its dealers in the base period years f. o. b. Dearborn, Michigan, which indicates that petitioner, in purchasing the bus chassis from Ford, would have had to bear that burden. Further, we do not feel that $7,500 as "other expenses" would have been sufficient to cover all of those items which have been suggested and enumerated by the respondent and which are not otherwise accounted for by petitioner's witnesses. As a general matter, however, we feel that petitioner's estimates are much more nearly correct than those contended for by the respondent, and, on the evidence at hand, have concluded and found as a fact that such expenses for petitioner for the year 1939 would have been $42,500.

On the basis of the constructive sale in 1939 of 189 Standard buses, at a gross profit of $185 each, and 294 DSR buses, at a gross profit of $92.50 each, petitioner's gross profit for that year would have been $62,160. Subtracting constructive administrative and other costs of $42,500, leaves a constructive net profit for 1939 of $19,660. Applying the stipulated average index figure for the base period of 91.2, the result is $17,929.92, which, in our findings herein, we have found as the fair and just amount representing normal earnings to be used as the petitioner's constructive average base period net income.

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*