SMITH'S HEATING, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 25647. Filed June 29, 1955.

*Jules G. Korner, 3rd, Esq.*, and *A. T. Allen, C. P. A.*, for the petitioner.

*George LeBlanc, Esq.*, and *Edward E. Pigg, Esq.*, for the respondent.

534

540

544

OPINION.

HARRON, *Judge:* The petitioner was not an acquiring corporation within the meaning of section 740. It was not in existence prior to January 1, 1940; therefore, it was not entitled to an excess profits credit under section 713 of the 1939 Code computed on average base period net income.

The Commissioner allowed an excess profits credit based on total invested capital under section 714 in the amount of $365.20. Petitioner's total invested capital, for the purpose of the credit, amounted to $4,564.99, which represents paid-in capital of $200, and earned surplus of $4,364.99. The credit was computed on the basis of 8 per cent of $4,564.99.

Petitioner seeks relief under sections 722 (a), 722 (c) (1), and 722 (c) (3) of the 1939 Code.[1] It alleges that excess profits tax computed without the benefit of those sections results in an excessive and discriminatory tax because a credit based on invested capital is an inadequate standard for determining excess profits. The reasons assigned are as follows: That within the meaning of 722 (c) (1), petitioner's business was in a class in which intangible assets (patent license), not includible in invested capital under section 718, made important contributions to income; and that within the meaning of 722 (c) (3), petitioner's invested capital was abnormally low.

The record establishes, and we have so found, that the petitioner's invested capital was abnormally low within the meaning of section 722 (c) (3). Where a taxpayer qualifies under any one of the three conditions set forth in (1), (2), and (3) of section 722 (c), it is entitled to receive consideration of its claim for relief. *Crossfield Products Corporation*, 20 T. C. 97; *Tin Processing Corporation*, 16 T. C. 713, 722; Regs. 112, sec. 35.722-4.

---

[1] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base perod net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, except that, in the cases described in the last sentence of section 722 (b) (4) and in section 722 (c), regard shall be had to the change in the character of the business under section 722 (b) (4) or the nature of the taxpayer and the character of its business under section 722 (c) to the extent necessary to establish the normal earnings to be used as the constructive average base period net income.

\*      \*      \*      \*      \*      \*      \*

(c) INVESTED CAPITAL CORPORATIONS, ETC.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer, not entitled to use the excess profits credit based on income pursuant to section 713, if the excess profits credit based on invested capital is an inadequate standard for determining excess profits, because—

(1) the business of the taxpayer is of a class in which intangible assets not includible in invested capital under section 718 make important contributions to income,

\*      \*      \*      \*      \*      \*      \*

(3) the invested capital of the taxpayer is abnormally low. In such case for the purposes of this subchapter, such taxpayer shall be considered to be entitled to use the excessive profits credit based on income, using the constructive average base period net income determined under subsection (a).

The question to be decided is whether petitioner is entitled to an amount for constructive average base period net income which would result in a credit in excess of the amount computed by the invested capital method and allowed by the respondent.

The petitioner had the burden of establishing a constructive average base period net income sufficient in amount to result in a credit in excess of $365.20 allowed by the respondent for the taxable period based on invested capital.

The petitioner requests us to find constructive average base period net income of $76,807.10. Using such figure, petitioner claims an excess profits credit under the income method of $72,966.74.

No useful purpose would be served by a detailed discussion of the method used by petitioner in arriving at the amount. Briefly, petitioner assumes that if it had been in existence during the base period years, it would have recapitalized with sufficient paid-in working capital to have enabled it to purchase materials at substantial savings; to maintain an inventory of finished goods which would be ready for sale prior to the season when the largest quantity of orders are received; to obviate the giving of discounts to induce sales; and to eliminate the need for making sales on credit. Also, petitioner assumes average yearly sales of 1,718 curers if it had been in existence during the base period years and if it had been recapitalized with sufficient working capital. Petitioner's proposed constructive average base period net income of $76,807.10 is based upon assumed sales of 1,718 curers, which represents twice the average number (859) of curers sold by the old company in the base period years. For reconstruction purposes, petitioner would use the old company's unit cost per burner in 1937, and the old company's average list selling price of a 22-burner curer in the base period years. Also, it would disregard, *inter alia*, the old company's practice of giving discounts to induce sales and to obtain cash; and it would disregard the operating losses of the old company. In its reconstruction, petitioner assumes that if it had been in existence during the base period years and had recapitalized to obtain adequate working capital, its chief stockholder, Forrest Smith, would have remained in control.

The respondent contends that petitioner has failed to establish a fair and just amount to be used as its constructive average base period net income. Respondent contends that petitioner must show that it could have operated at a profit in the base period years, if it had been in existence, in order to support any reconstruction of earnings. *Harry Lang Manufacturing Co.*, 19 T. C. 567. Respondent contends that petitioner has not shown wherein it would have operated in any manner which was different from the operations of the old corporation, except that it hopes it would have done everything on a larger scale. Respondent attacks petitioner's assumption that if it had been

in existence during the base period years it would have sold 1,718 curers, which number is twice the average number of curers which the old company sold in the base period years, namely, 859 curers. Respondent contends that there is no evidence which supports such assumption.

The petitioner must establish "what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income * * * ." The petitioner has the burden of establishing what amount would constitute its normal earnings if it had been in existence during the base period years. Consideration of all of the evidence compels the conclusion that petitioner has not made the necessary showing.

The petitioner assumes that during the base period years, its normal sales would have been an average of 1,718 curers per year. In the taxable year 1945, in a market which reflected the impetus of pent-up war demand, scarcity, and cash in the hands of buyers, the petitioner sold only 1,453 curers. We are not persuaded by the evidence that petitioner's average annual sales during the base period can be assumed to be as great as 1,718 curers. The petitioner's assumption disregards conditions which existed during the base period years in a competitive market for oil-burning curers in the flue-curing tobacco area. Furthermore, the petitioner has failed to establish that its experience, if it had existed during the base period years, would have been substantially or even moderately different from the experience of Smith's Heating System, Inc., the earlier company, which made and sold the same product, under the same trade name, in the same area, and under the direction of the same manager and chief stockholder, Forrest H. Smith.

If petitioner had been in business during the base period years it would have had to promote its product in an undeveloped market, offer inducements to tobacco growers to convert from wood-burning to oil-burning curers, extend credit, and compete with two or more others who manufactured oil-burning curers and sold them in the same area. Petitioner, in the base period years, would have had to incur expenses, such as those of advertising and promotional work, and to have adjusted the selling price of its product to what buyers were willing to pay in a buyer's market. Petitioner, in 1939, would have encountered the difficulty of finding a large number of buyers who were able to pay for its product at a time when their income and buying power was reduced because the price of tobacco fell from 23.16 cents per pound to 15.2 cents per pound, and, in August, was practically eliminated by the closing of the tobacco market in eastern North Carolina.

Furthermore, the evidence does not persuade us that petitioner, if it had been in existence in the base period, could have obtained additional working capital without changing its management and methods of operation; that is to say, without having control pass from Forrest

H. Smith to an investor. The evidence shows that individuals who, in the base period, demonstrated interest in investing risk capital in the old company made the acquisition of a controlling interest a condition of advancing capital. As we pointed out in *Tin Processing Corporation, supra,* p. 724,

We believe as stated in the Bulletin on section 722, Part V (f), that " * * * implicit in this comparison is the idea that the normal operating conditions upon which relief is based and the 'operating conditions during the excess profits tax period must be comparable * * *." Having determined the nature of the taxpayer and the character of its business we think that the law required that the constructive income for the base period years must be on the basis of an operation of the same type.

The contentions of the petitioner present the question whether we can assume, upon the record in this case, operations during the base period years as successful as petitioner's operations in the taxable year 1945. Petitioner assumes an average base period net income of $76,807.10. However, its net profit for 1945, during the war economy, amounted to less, namely, $71,099.36. We must conclude that it is unrealistic, upon due consideration of the entire record, to assume that petitioner would have enjoyed during the base period years the same expansion of business and increase in profits as it realized in 1945 under the stimulation of wartime marketing conditions. We are provided with evidence of the unreality of petitioner's assumption by the experience in 1938 of the earlier company. In 1938, it planned to manufacture and sell 2,000 curers and advertised the Smith curer extensively to achieve that goal. But the sales of the old company in 1938 amounted to only 981 curers, many of which were made on credit.

Even if we assume additional working capital in the base period, it does not necessarily follow that petitioner could have operated profitably, or that it could have avoided operating at a loss in some of the base period years. Petitioner's assumption contemplates both the ability of buyers to pay for its product in the base period and a demand for an average volume of sales of 1,718 curers. Petitioner assumes a large *potential* market in the base period without presenting proof of an equal ability of the potential buyers to make payment for the product. It was the lack of paying power which led to the eventual failure of the earlier company.

Petitioner's proposed average base period net income amounts to little more than an assertion of the ultimate fact. We must have better proof than mere assertion of the ultimate fact. *Arden-Rayshine Co.,* 43 B. T. A. 314; *Transit Buses, Inc.,* 20 T. C. 999.

It is petitioner's experience in 1945, a post base-period year, which gives the chief, if not only, support for petitioner's contention. We may not take into account the taxpayer's experience in an excess profits

year in determining the extent to which the profits in an excess profits year were excessive. *Transit Buses, Inc., supra*, p. 1010.

It is concluded that petitioner's reconstruction is unsupported by the evidence. We have searched the record, without success, to find an appropriate basis upon which a lesser figure could be found as a fair and just amount representing constructive normal earnings, in the light of what would constitute normal operating conditions for petitioner during the base period. Upon the evidence before us, we are unable to make any determination which would provide relief. The petitioner's claim for relief must be denied.

Petitioner is liable for a deficiency in excess profits tax in the amount of $14,361.34 by reason of having deferred payment of that amount under the provisions of section 710 (a) (5) of the 1939 Code.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*