Paul V. Weir and Margaret G. Weir v. Commissioner. Paul V. Weir v. Commissioner.
Weir v. Commissioner
Docket Nos. 48882, 49550.
United States Tax Court
T.C. Memo 1958-158; 1958 Tax Ct. Memo LEXIS 69; 17 T.C.M. (CCH) 781; T.C.M. (RIA) 58158; August 21, 1958
*69 Held: (1) Certain checks issued by corporations owned or controlled by petitioner, Paul Weir, during the taxable years constituted income to Paul. The amounts determined. (2) Petitioner realized short-term capital gain from the sale of the Mansfield Apartments. The amount determined. (3) Certain losses sustained by petitioner in 1949 were from non-business debts within the meaning of section 23(k)(4), I.R.C. of 1939. (4) Respondent has not established that any part of the deficiencies for the years involved were due to fraud with intent to evade tax. James H. Larva, Esq., 50 East Broad Street, Columbus, Ohio, and Henry J. Linton, Esq., for the petitioners. Lyman G. Friedman, Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: The respondent determined deficiencies in income tax and additions to tax under section 293(b), Internal Revenue Code of 1939, as follows: Paul V. Weir and Margaret G. Weir,
Docket No. 48882
Addition to Tax
Year
Deficiency
Sec. 293(b)
1948
$ 24,708.52
$12,354.26
1949
127,424.86
63,712.43
Paul V. Weir, Docket No. 49550
1945
$ 14,789.86
$ 7,394.93
1946
38,232.96
19,116.48
1947
73,610.04
36,805.02
Respondent has conceded on brief that he erroneously *70 included in petitioners' gross income for the year 1949 the amount of $56,497.67 representing the amount received by the Guarantee Title & Trust Co. for the sale of an apartment building known as the 650 East Town Street Apartments. There are five issues for decision: 1. Whether petitioners received unreported income during each of the years in issue in the form of checks issued by companies owned or controlled by Paul. 2. Whether petitioners realized shortterm capital gain from the sale of the Mansfield Apartments, and if so, the amount thereof. 3. Whether Paul sustained a business loss in 1949 due to the worthlessness of a debt owed by Mansfield Apartments, Inc. 4. Whether petitioners sustained business losses or business bad debts in 1949 due to the worthlessness of debts owed by Continental Mortgage Company and Guarantee Title & Trust Company. 5. Whether any part of the deficiency for each of the years in issue was due to defraud with intent to evade tax. Findings of Fact The stipulated facts together with attached exhibits are found as facts and are incorporated herein by this reference. Paul V. Weir and Margaret G. Weir resided in Mansfield, Ohio, during the years 1945 to 1949, *71 inclusive. Paul filed individual Federal income tax returns for the years 1945 to 1947, inclusive, with the collector of internal revenue at Cleveland, Ohio. Petitioners filed joint Federal income tax returns for the years 1948 and 1949 with the collector of internal revenue at Cleveland, Ohio. Paul was born in Ohio in 1899. After attending Purdue University he worked for approximately six years as a mechanical engineer and then went into the real estate business with his father, who had an office in Mansfield, Ohio. In 1936 Paul was engaged in the home building and mortgage business in Mansfield and represented the Mansfield office of the Continental Mortgage Company of Columbus, Ohio, (hereinafter referred to as Continental). In 1936 Paul acquired an option on the stock of Continental and took over the direction of its operation. Continental was in the mortgage loan business and acquired most of its business by acting as the mortgage loan correspondent of the Metropolitan Life Insurance Company. About two years later Paul acquired an option to buy the stock of the Guarantee Title and Trust Company (hereinafter referred to as Guarantee), and became its executive vice-president and *72 member of the board of directors. Guarantee was organized as a mortgage loaning institution and also issued title insurance. Paul acquired title to the stock of Guarantee about 1940. The Capital Investment Company (hereinafter referred to as Capital) was a corporation all of whose stock was owned by Guarantee and was organized to operate and manage real property which had been subjected to mortgage foreclosure. The Capital Investment Company Recreation Account (hereinafter referred to as Recreation) was a company that operated certain bowling alleys. The Broad Realty Company (hereinafter referred to as Broad Realty) was organized to do general real estate business. It operated the Broad-Ohio Apartments. The stock of Broad Realty was owned by Paul. Mansfield Apartments, Inc., was organized in 1944 to build an apartment building in Mansfield, Ohio, under the priorities granted by the Federal Housing Administration. The apartments were constructed accordingly and were known as the Mansfield Apartments. During the period from January 1, 1945 to July 19, 1949, Paul owned the stock of or controlled all of the companies mentioned above. Such companies will hereinafter sometimes be collectively *73 referred to as the "Weir companies." In 1945 Paul was the executive vice-president of Guarantee and in 1946 he became president of that company. He remained president of Guarantee and was president of Continental during the years in issue. During the period in issue, the main offices of Continental and Guarantee were located at 22 West Gay Street, Columbus, Ohio. The companies had branch offices in various Ohio cities. The total number of persons employed by the Weir companies was approximately one hundred. Respondent determined that Paul received unreported income from some of the Weir companies in the form of approximately 400 checks issued by these companies. The parties have entered into a stipulation with respect to such checks. They have stipulated the drawer (in each instance one of the Weir companies), the payee, the drawee, the amount thereof and in most instances the date of issuance and check number. Apparently because of arithmetical errors and duplications, in some instances respondent's determination and the checks upon which it is based do not correspond. The following schedule reflects the companies issuing such checks determined to be income to Paul, the years of *74 issue, and the aggregate amounts thereof according to respondent's determination. The footnotes reflect arithmetical and duplication errors contained in his determination as shown by the stipulation of facts. 1945
1946
1947
1948
1949
Continental
$11,594.15
[1] $ 8,649.03 [3] $14,516.66 $ 9,086.51
$43,535.14
Guarantee
17,100.00
[2] 52,107.00 12,508.99
35,007.62
56,872.67
Capital
1,076.92
14,000.62
Property
1,202.00
[4] 5,306.55 1,346.28
Management
Recreation
742.37
13,408.99
Broad Realty
[5] 59,757.24 Respondent determined the following amounts of net income were reported by petitioners: 1945
$ 6,169.39
1946
10,539.39
1947
10,063.06
1948
8,346.98
1949
10,923.13
During the period in issue, Continental and Guarantee paid the rental *75 and other costs of an apartment in the Neil House, a hotel in Columbus. Such apartment was used by Paul and consisted of at least three rooms, a bedroom, a conference and sitting room, and a kitchen. It contained at least one filing cabinet, an adding machine, and a phone directly connected to the switchboard of the main offices of the companies. Paul met with various business associates at the apartment in connection with business transactions. The apartment was more richly furnished than Paul's office at the main office of the companies. During this period Paul maintained his residence in Mansfield. When he stayed overnight in Columbus he used the bedroom in the Neil House apartment as his sleeping quarters. Paul's principal duties during this period were to keep in contact with the various insurance companies and to promote the business of the companies in general. Paul attempted to spend approximately one working day each week in Dayton and in Mansfield, Ohio. During all the years in issue Paul's principal place of employment was at Columbus, Ohio. Among the checks included in respondent's determination are checks in the following aggregate amounts issued payable to the Neil House *76 in payment of accounts rendered by the Neil House in respect of the apartment occupied by Paul: Continental
Guarantee
1945
$2,817.42
1946
3,529.55
1947
5,973.68
1948
7,862.75
$500.00
1949
3,877.17 The following amounts of such checks did not represent payment of Paul's personal living expenses: 1945
$2,253.94
1946
2,823.64
1947
4,778.95
1948
6,690.20
1949
3,101.74 Margaret inherited property consisting of two farms located near Mansfield. Among the checks included in respondent's determination are checks issued in 1947, payable to Margaret in the amount of $18,700 which were issued by Guarantee. Margaret did not sign any note or execute any other instrument evidencing indebtedness with respect to such checks. Such checks were issued for the benefit of Paul. Employees of the Weir companies sometimes were required to travel in connection with the business of the companies. The companies paid for the expenses incurred in connection with such travel, either by giving the employee a sum of money before the particular trip, or by reimbursing the employee after the completion of the trip for expenses incurred thereon. In each instance an expense voucher was submitted by the employee as evidence of amounts expended. *77 During the period in issue, the Weir companies made gifts of liquor to various individuals. During the years in issue, Paul issued personal checks to various individuals in payment of expenses of some of the Weir companies. To the extent of the amounts set out below, the checks in issue represent reimbursement to Paul of such expenditures: 1945
$2,620.00
1946
6,075.00
1947
5,115.90
1948
8,862.61
Among the checks constituting the basis of respondent's determination are checks issued by Continental to various clubs of which Paul was a member. To the extent set out below, the amounts of such checks were not issued for the personal benefit of Paul, but represented business entertainment expenses of Continental: 1945
$ 20.00
1946
191.01
1947
299.48
1948
154.34
1949
49.30
Among those checks constituting the basis of respondent's determination are checks issued to petitioners' domestic servants in the following amounts: 1947
$2,792.02
1948
2,928.84
1949
375.00
On August 31, 1949, Continental was indebted to the Mansfield Savings Trust National Bank (hereinafter referred to as the Bank) in the total amount of $121,550 which was past due and payable. Such indebtedness was evidenced by a note upon which Paul was personally *78 liable as guarantor. On this date the Bank was demanding payment of the amount due and Continental was unable to pay. To keep the business going, petitioners entered into an agreement with the Bank on that date whereby in consideration of the Bank's withholding the taking of judgment and levying execution respecting the indebtedness of Continental, petitioners agreed to and did deliver to the Bank deeds to various lots owned by petitioners and a deed of the Mansfield Apartments from Mansfield Apartments, Inc. Other pertinent provisions of the agreement are as follows: * * *
"6. Paul V. Weir undertakes and agrees to deliver to the bank certified copy of waiver of notice of a special meeting of Directors; and minutes of the Directors' Meeting and Resolution of the Mansfield Apartments, Inc., authorizing the conveyance of Mansfield Apartments to Weir, or his nominee, in consideration of the cancellation of an indebtedness owing by Mansfield Apartments, Inc., to Paul V. Weir in the amount of $45,891.52, plus interest from January 1, 1949, and said conveyance being accepted by Weir in full satisfaction of the account hereinbefore mentioned and all other accounts or amounts due him for money *79 advances or for any other reason whatsoever; certified copy by the Directors of Remington Realty Company of a consent to the disposition of Mansfield Apartments by Mansfield Apartments, Inc., by Remington Realty Company, the owner of all the issued and outstanding shares of Mansfield Apartment, Inc.; and certified copy of waiver of notice of special meeting of the directors called for the purpose of approving such disposition; certified copy of waiver of notice by all of the shareholders of Remington Realty Company of a special meeting and of the action of the shareholders of said company approving the action of the directors hereinbefore mentioned. "7. It is understood and agreed that the bank at its option may accept these conveyances in full payment of the obligation of The Continental Mortgage Company in the event the amount due with interest has not otherwise been paid by the Weirs on or before February 20, 1950. It is understood and agreed that at any time hereafter any of the lots including the residence property and Mansfield Apartments, Inc., may be sold at a price mutually agreeable to the bank and Paul V. Weir and that the proceeds thereof, less any commissions or any proper *80 expenses, shall be credited to the amount owing by the Continental Mortgage Company and that if at any time through sale or otherwise the amount due from the Continental Mortgage Company and any indebtedness of the Weirs to the bank plus interest, is paid, the bank shall convey to the Weirs any property remaining in its hands which it has received from the Weirs and Mansfield Apartments, Inc., as a result of or growing out of this agreement." * * *
On November 25, 1949, the Bank conveyed by deed to Farm Tools, Inc., property known as Mansfield Apartments. On or about November 26, 1949, the Bank received $125,000 from Farm Tools, Inc., as proceeds from the sale of the Apartments. Farm Tools also assumed an outstanding mortgage in the amount of $144,000. The Bank distributed or applied the proceeds as follows: Funds Received
Sale of Mansfield Apartments - Received Nov. 1949
$125,000.00
Balance of checking account of Mansfield Apartments,
Inc.
with bank
2,293.44
Total
$127,293.44
Funds Paid Out or Applied
Paid to McDermott & Associates - Attys.
$ 86.95
Paid to County Recorder - filing fees
10.45
Paid for Revenue stamps - deed to bank
137.50
Paid for Revenue stamps - deed to Farm Tools
137.50
Paid for Revenue stamps - deed to Frush
8.80
Paid for Revenue stamps - deed to Millsboro Const.
8.25
Paid for Photostat of mortgage
6.00
Paid for exchange fee on check
2.50
Paid for Revenue stamps - deed to Auer
4.50
Paid to bank for telephone and telegraph charges
47.50
Paid to J. H. Congwer - attorney
855.34
Paid to H. Welsh - commission on sale
13,450.00
Paid to J. J. Welsh Insurance Agency
9.38
Paid for disbursements in excess of receipts on man-
agement of Mansfield Apts.
339.63
Applied on Continental Mtge. Co. note to bank
82,544.00
Applied on interest on said note
1,826.43
Applied on real estate taxes on Mansfield Apts.
2,018.68
Paid to Farm Tools, Inc., Oct., Nov. rent
2,254.32
Paid for miscellaneous expenses
19.15
Applied on $120,000 note Paul V. Weir guaranteed for
Guar. Title & Trust
20,000.00
123,766.88
Balance - Paid to Paul V. Weir, Sept. 26, 1950
$ 3,526.56
*81 During September and October 1949, the lots referred to above were sold by the Bank for the aggregate amount of $19,125. The indebtedness in the amount of $121,550 owed to the Bank by Continental and referred to above, was paid as follows: Date
Explanation
Amount
9/ 1/49
Checking account Continental Mortgage Co.
$ 19,881.00
9/16/49
Proceeds from sale of lots to Frush
8,000.00
10/ 7/49
Proceeds from sale of lots to Millsboro Const. Co.
7,125.00
10/10/49
Proceeds from sale of lots to Auer
4,000.00
11/26/49
Proceeds from sale of Mansfield Apts.
82,544.00
Total
$121,550.00
Continental was in poor financial condition at this time. Its contract with the Metropolitan Life Insurance Company was canceled and its charter was canceled as a result of its nonpayment of franchise taxes. The debt owed Paul by Continental as a result of his satisfying its obligation to the Bank became entirely worthless in 1949. Respondent determined that on the joint return filed by petitioners for 1949 they reported the purchase of the Mansfield Apartments and its subsequent sale within a period of approximately three months. He determined that petitioners reported a "net short-term gain" from such transaction in the amount of $74,460.69. *82 In the notice of deficiency respondent determined that the profit derived therefrom was $105,912.66 and that such amount was taxable to petitioners as ordinary income. Respondent computed such gain as follows: Amount received on sale
$268,290.35
Plus: Depreciation claimed
1,237.50
Total
$269,527.85
Less: Cost - Mortgage assumed
$144,575.37
Miscellaneous costs (abstracts etc.)
957.71
O.B.A. assumed
4.00
Accts. payable received: Amt. paid for ranges
$4,529.85
Invested in accts. payable
9,000.00
13,529.85
Total cost basis
159,066.93
Gross profit
$110,460.92
Less: Cost of sale (commission)
4,548.26
Net profit on sale
$105,912.66 Petitioners realized short-term capital gain in the amount of $70,528.14 from the sale of Mansfield Apartments. In 1949 Guarantee was indebted to the Bank in the amount of $120,000 evidenced by a note upon which petitioners were personally liable as guarantors. On July 18, 1949, Paul entered into an agreement with Charles J. McGreevy, the pertinent portion of which is as follows: "AGREEMENT "This agreement made and entered into this 18th day of July, 1949, by and between Paul V. Weir, hereinafter designated 'Weir' and Chas. J. McGreevy, hereinafter designated 'McGreevy,' WITNESSETH: "WHEREAS, *83 Weir is the owner of all of the common capital stock of The Guarantee Title and Trust Company, namely - 1480 shares, and is also the owner of all of the common capital stock of The Broad Realty Company, namely - 600 shares, and "WHEREAS, The Guarantee Title and Trust Company is indebted to The Mansfield Savings Trust National Bank of Mansfield, Ohio, in the amount of One Hundred Twenty Thousand Dollars ($120,000.00), and "WHEREAS, said The Mansfield Savings Trust National Bank has demanded additional security for said note and Weir has personally assumed the liability thereunder, and "WHEREAS, The Broad Realty Company is indebted to The Guarantee Title and Trust Company on a promissory note in the amount of One Hundred Twenty-Five Thousand Dollars ($125,000.00), dated December 18, 1948, and secured by a second mortgage on the real estate known as The Broad-Ohio Apartment Building, and is also indebted to The Guarantee Title and Trust Company for advances made by The Guarantee Title and Trust Company for the purpose of making the required payments on the first mortgage on said The Broad-Ohio Apartment Building to The National Life and Accident Insurance Company of Nashville, Tennessee, *84 and "WHEREAS, The Broad Realty Company is the holder of certain shares of the preferred stock of The Guarantee Title and Trust Company, and "WHEREAS, The Broad Realty Company is the holder of the common capital stock of The Recreation Company, namely - 250 shares, and The Guarantee Title and Trust Company is the holder of a note from The Recreation Company in the amount of Sicty-Three Thousand Dollars ($63,000.00), secured by a chattel mortgage on certain chattels and equipment located in the premises known as The Gettrost Building, 44 North Front Street, Columbus, Ohio, and "WHEREAS, McGreevy is willing to purchase the common capital stock in The Guarantee Title and Trust Company and the fee interest in said The Broad-Ohio Apartment Building, subject to the balance due on the first mortgage to The National Life and Accident Insurance Company, together with the common capital stock in The Recreation Company and the promissory note and chattel mortgage from The Recreation Company in the original amount of Sixty-Three Thousand Dollars ($63,000.00), and "WHEREAS, the value of each of the assets is questionable and highly speculative, and "WHEREAS, by the terms of the sale of said assets *85 to McGreevy The Mansfield Savings Trust National Bank will be secured and The Guarantee Title and Trust Company will be relieved from all liability on said note. "NOW, THEREFORE, in consideration of the colenants hereinafter contained, the parties agree as follows: "(1) Weir agrees to sell, transfer and assign to McGreevy all outstanding shares of the common capital stock of The Guarantee Title and Trust Company, namely, 1480 shares, for the price of Fifteen Thousand Dollars ($15,000.00), payable as hereinafter provided; "(2) Weir agrees for The Broad Realty Company, in order to compromise its debt with The Guarantee Title and Trust Company on said One Hundred Twenty-five Thousand Dollars ($125,000.00) promissory note and advances by The Guarantee Title and Trust Company for and on behalf of The Broad Realty Company, to transfer and assign to The Guarantee Title and Trust Company 900 shares of the preferred stock of The Guarantee Title and Trust Company together with the common stock of The Recreation Company, and to execute and deliver to McGreevy a Warranty Deed for the real estate known as The Broad-Ohio Apartment Building, located at the corner of East Broad Street and Ohio Avenue *86 in the City of Columbus, Ohio, subject to the balance due on the first mortgage to The National Life and Accident Insurance Company, for a consideration of Sixty-Five Thousand Dollars ($65,000.00), to be paid as hereinafter provided by McGreevy for said The Broad-Ohio Apartment Building, subject to the first mortgage. "(3) Weir agrees that The Guarantee Title and Trust Company will transfer to McGreevy the common capital stock of The Recreation Company, together with said promissory note in the amount of Sixty-Three Thousand Dollars ($63,000.00) from The Recreation Company to The Guarantee Title and Trust Company and the chattel mortgage securing said note covering certain chattels and equipment located in the Gettrost Building, 44 North Front Street, Columbus, Ohio, at a consideration of Twenty Thousand Dollars ($20,000.00), to be paid as hereinafter provided. "(4) McGreevy agrees to pay Weir the sum of One Hundred Thousand Dollars ($100,000.00), being the consideration hereinbefore set forth in Sections 1, 2 and 3 hereof, and Weir agrees to pay said One Hundred Thousand Dollars ($100,000.00) to The Mansfield Savings Trust National Bank as credit upon said note of One Hundred Twenty *87 Thousand Dollars ($120,000.00) executed by The Guarantee Title and Trust Company in favor of said bank, and Weir further agrees to pay to said bank the balance due on said note in the amount of Twenty Thousand Dollars ($20,000.00), together with accrued interest;" * * *
The indebtedness of Guarantee referred to above was fully paid on August 20, 1949. Opinion Petitioner Paul either owned all of the stock or had controlling interests in several corporations during the period in issue, and was president or executive vice-president of both Continental and Guarantee. The respondent determined that amounts represented by over 400 checks issued by the companies during this period constituted additional unreported income to Paul because such checks were determined to have been issued "for your [Paul's] benefit." The petitioners dispute this determination for a number of reasons to be more particularly discussed later, but they do not dispute the theory underlying respondent's determination, i.e. checks issued by an employer for the personal benefit of an employee taxpayer constitute income to such taxpayer within the meaning of section 22 (a), Internal Revenue Code of 1939. [1] Cf. Old Colony Trust Co. v. Commissioner, 279 U.S. 716; *88 Alex and Doris Silverman, 28 T.C. 1061, affd. 253 Fed. (2d) 849. Preliminarily, it is to be noted that the amounts of the checks constituting the basis of respondent's determination of additional income have been stipulated, and as we have set out in our findings, due to arithmetical and duplication errors in respondent's determination, in some instances it does not equal the total of the respective group of checks upon which it is based. *89 Apparently, the parties concede that the aggregate amounts of the stipulated checks rather than such erroneous determination of respondent be reflected in the computation under Rule 50. The first issue in this case is whether the respondent correctly determined that several hundred checks issued by the Weir companies during the period in issue constituted income to Paul within the meaning of section 22(a), Internal Revenue Code of 1939. In order that we may clarify this issue as much as possible, it is proper at this time to note that on brief respondent has conceded his determination to be erroneous with respect to some of the checks involved. Such concessions were listed in respondent's brief under a heading "Conceded Herewith By Respondent." The aggregate amounts of the checks to which respondent's concession applies according to the years of issuance are as follows: 1945
$ 6,346.14
1946
17,231.07
1947
13,862.98
1948
331.14
The checks in issue may be divided into two categories: the first category includes those upon which either of petitioners was named as payee, or whereon the payee was designated "Cash" and which were not shown to have been endorsed by persons other than petitioners. *90 We shall now discuss the checks in the first category. Generally the petitioners' position with respect to these checks is that they constitute reimbursement of amounts loaned by Paul to the companies or amounts expended by Paul for the benefit of the companies. Respondent does not dispute that if the checks in issue are in fact such reimbursements, they do not constitute income to Paul. The aggregate amount of checks in issue which petitioners claim constitute such reimbursement and the year of issuance are as follows: 1945
$15,785.00
1946
23,553.74
1947
5,115.90
1948
14,000.14
1949
38,550.00 To support their position, petitioners placed in evidence a number of personal checks issued by Paul payable to various of the Weir companies which petitioners claim to represent loans by Paul to the companies. The payee, aggregate amount, and year of issuance of such checks is as follows: 1942
1948
Guarantee
$25,000
$75,000
Continental
88,950
Capital
55,700
Also placed in evidence were a number of personal checks issued by Paul to third parties, part of which petitioners claim represent Paul's expenditures for the benefit of the Weir companies. The aggregate amount of such checks and year of issuance are as *91 follows: 1945
$ 6,337.88
1946
7,792.17
1947
8,627.54
1948
19,646.93 It is such personal checks issued by Paul upon which petitioners rely as being the basis of their claim that the checks in this category constitute reimbursements. In this posture, the issue with respect to the checks in this category is one of fact, to be resolved in view of all the evidence. It is obvious that petitioners' position can be maintained only if they show (1) that the checks issued by Paul were loans or advances to the companies; and (2) that the checks in issue constitute reimbursement of such loans or advances. Except as hereinafter noted, we think the petitioners have failed to sustain their burden. To establish the character of the checks issued by Paul, petitioners rely entirely upon Paul's testimony. Paul testified that the checks issued by him to the companies constituted loans and in most instances very briefly stated the facts surrounding the purported loan. No note or other evidence of indebtedness was introduced respecting such checks, and Paul testified that in most instances no note was executed. Paul testified that he was using his credit to aid the companies and that the amount of the checks *92 issued by him probably had been borrowed by him. However, no evidence of such borrowing by Paul was introduced, although Paul testified that he had in his possession the bank ledger sheets showing the amount of such borrowing. It is also to be noted that Paul's testimony and petitioners' present position are inconsistent in that he testified that a check issued by him to Guarantee on December 31, 1942, in the amount of $25,000 was to enable the company to show a better cash position at the end of the year, in order to supply temporary funds to close a mortgage transaction, and petitioners are now contending that checks issued to Paul in 1945 were reimbursement of such temporary loan. With respect to the checks issued by Paul to third parties, Paul's testimony was again the only evidence submitted to show their character. He testified with respect to each of such checks and stated the nature of the expense involved. In general they purportedly represented amounts of travel expense of Paul, or payment of various items of company expense. Some, Paul admitted, were personal. Thus, although the checks are evidence that Paul did spend the amounts thereof, the only evidence of the purpose *93 and character of such checks is Paul's unsupported and self-serving testimony. We recognize that we may not arbitrarily disregard uncontradicted, unimpeached competent testimony of a taxpayer, Jay A. Williams, 28 T.C. 1000, nor do we do so here. However, where the testimony of witnesses and other evidence were available with respect to the facts in issue and such witnesses were not called nor such evidence introduced, it is properly inferable that such testimony and evidence would have been unfavorable to the party having the burden of proof, in this instance the petitioners. Stoumen v. Commissioner, 208 Fed. (2d) 903, affirming a Memorandum Opinion of this Court dated December 10, 1953 [12 TCM 267]; Wichita Terminal Elevator Co., 6 T.C. 1158, affd. 162 Fed. (2d) 513; Interstate Circuit v. United States, 306 U.S. 208. In the instant case, Paul's testimony indicates that he was constantly loaning money to and expending personal funds for the benefit of the companies. Several thousand dollars were involved in each of the years in issue. The petitioners called as witnesses several officers and directors of the Weir companies. However, not one question was asked such witnesses *94 relating in any manner to the alleged loans and advances by Paul. These officers were all apparently active in the management of the companies and it is inconceivable that they were unaware of the companies' financial condition and could not have corroborated Paul's testimony if true. In this instance it is to be noted that Paul testified that two of such witnesses, W. B. Ford and Morgan Jones, were recipients of suits purchased by him. Such purchases purportedly were made for the companies and the amount thereof, Paul testified, was to be reimbursed. These purchases were included in the group of checks purportedly issued by Paul to third parties for business purposes. Neither Ford nor Jones gave any testimony with respect to such purported transactions, nor did any of the testimony of the officers of the companies tend to support in any way petitioners' position with respect to the checks in this category. Moreover, petitioners did not offer in evidence the bank ledger sheets in Paul's possession purportedly corroborating Paul's unsupported testimony that he was using his credit during all of the years to help the companies. Furthermore, it appears that Paul had examined the records *95 of the companies after receiving the notices of deficiency and that his testimony was in part purportedly based upon such records. Such records were apparently available. Although four pages of the Journal of Guarantee were placed in evidence, none of such records tended to support petitioners' position with respect to the checks in this category, and petitioners do not rely upon such records on brief. In the case of small, closely held corporations where corporate affairs are in many instances conducted somewhat informally it is possible that in dealings between the sole stockholder and the corporation there would be an absence of formal records or independent evidence pertaining to the nature of such transactions. However, in the instant case, although it appears that the stock was closely held, as pointed out above, it does not appear that pertinent evidence relating to the factual issues present was unavailable. In the absence of any reasonable explanation regarding the failure of presentation of such pertinent evidence we can give little credence to the self-serving uncorroborated testimony of the taxpayers. In view of petitioners' failure to introduce such evidence, we think *96 it only reasonable to infer that such evidence if presented would have been unfavorable to petitioners, and our belief that petitioners have failed to give a frank and forthright explanation of the facts underlying these transactions is strengthened. Also damaging to the petitioners' cause is the fact that in most instances there appears to be little, if any, relation between the amount and date of the purported loans and advances and the amounts of so-called reimbursements. In most instances Paul made no attempt to relate them, but merely testified that the checks issued to him were "reimbursements," which in itself is merely a statement of the ultimate fact to be determined and insufficient to support the burden of proof. See Arden Rayshine Co., 43 B.T.A. 314; Transit Buses, Inc., 20 T.C. 999. However, contradictory as the record is, after a considerable study of all the evidence we are convinced that during the years in issue, Paul did make a certain amount of expenditures for the benefit of or loans to the companies, the reimbursement of which is represented by some of the checks in issue. In view of all the facts and exercising our best judgment, in accordance with the principle *97 of Cohan v. Commissioner, 39 Fed. (2d) 540, we have found that of the checks in issue, the following amounts thereof constituted reimbursements of amounts loaned or expended by Paul for the benefit of the Weir companies, which finding shall be reflected in the Rule 50 computation: 1946
6,075.00
1947
5,115.90
1948
8,862.61
At the hearing Paul admitted that certain checks in this category were income to him, but claimed that he had reported such amounts on his income tax returns. No returns or other evidence were introduced to support this testimony. Also included in this category are checks issued to Margaret in the amount of $18,700 which petitioners claim to have been a loan. The only evidence consisted of Margaret's testimony. She stated that she did not know the terms of the loan and added that it was all arranged by Paul. She then testified on cross-examination as follows: "Q. Well, do you know what the terms were? "A. No. He [Paul] was going to pay it back as soon as the farm - "Q. He was going to pay it back? "A. I was going to, if - from the farm, if we made any money so that we could return it to the company * * * "Q. Did you sign a note? "A. No, I didn't." Margaret's testimony *98 not only is unpersuasive that the checks constituted loans to her, but clearly demonstrates that they were made payable to her merely as a nominee and in fact were issued for the benefit of Paul. No other evidence was presented with respect to such checks and accordingly we have not disturbed respondent's determination. The checks in dispute in the second category are those which were payable to parties other than petitioners or which were payable to "Cash" and shown to have been endorsed by persons other than petitioners. The respondent determined that the checks in the second category constituted income to Paul since they represented payment of his personal expenses. As pointed out above, petitioners do not dispute respondent's theory that payment of a taxpayer's personal obligations and expenses by his employer constitutes income to the taxpayer. Generally petitioners' position is that such checks were not issued for their benefit but were issued for company business purposes and accordingly were not income to petitioners. Paul did admit that certain checks in this category were for payment of personal expenses. The evidence with regard to such checks mainly consisted of the stipulated *99 number, drawer, payee, date and amount of each check together with Paul's testimony, which in most instances merely consisted of his statement that no benefit was received from the issuance of such check. Petitioners urge that Paul's denial that any benefit was received, coupled with the fact that the checks were not payable to or endorsed by them, is sufficient to overcome the presumptive correctness of respondent's determination, that the burden was upon respondent to go forward with the evidence and in view of respondent's failure to do so the petitioners' position must be sustained. We do not agree. First, although the fact that the checks were not payable to or endorsed by petitioners in some instances might be entitled to a certain amount of weight in determining whether such checks were issued for the benefit of petitioners, that is not so in the instant case, since by Paul's own admission several of such checks were in fact issued for petitioner's personal benefit. Secondly, Paul's testimony with regard to such checks did not purport to disclose any of the underlying facts necessary to be known to determine the purpose of the issuance of such checks. Paul merely denied that *100 such checks were issued for his benefit. As such, his testimony was simply an assertion of the ultimate fact in issue for which it is offered as proof, and is not sufficient to support petitioners' burden. Although respondent states on brief that a portion of certain of such checks may not have been issued for the benefit of petitioners, he apparently makes no concession as to any amounts. Except as hereinafter noted, the petitioners have failed to introduce sufficient evidence to show that any amount of such checks so designated by respondent were not issued for their benefit, and an approximation under the Cohan rule [2] is not warranted. However, included in this category are checks issued by Continental and Guarantee to the Neil House in payment of accounts submitted by it in the name of Paul Weir in connection with the apartment maintained there. Respondent now admits that the Neil House apartment was in part an office and was used for business purposes. This was also established by testimony of various company officers. Respondent contends, however, that the amounts billed by the Neil House also included personal living expenses of Paul *101 and to that extent are income to him. Petitioners do not contend that part of Paul's living expenses are not included in the accounts but they argue that payment of Paul's living expenses in Columbus did not constitute income to him since such expenses were incurred "away from home" within the meaning of section 23(a), Internal Revenue Code of 1939, [3] *103 which provides for the deductibility of certain personal expenses when incurred away from home. Petitioners contend that Paul's "home" was at Mansfield. Their argument cannot be sustained. If a taxpayer chooses for reasons personal to him to maintain his principal place of residence at a place other than his principal place of employment, his living expenses at his principal place of employment do not lose their character as nondeductible personal expenditures. Commissioner v. Flowers, 326 U.S. 465; Joseph H. Sherman, Jr., 16 T.C. 332. In the instant case it is clear that Paul's principal place of employment was at the main offices of the companies which were located in Columbus, and that Paul kept his residence in Mansfield for personal reasons. Petitioners' argument that Paul's principal place of employment was in Mansfield is not *102 supported by the evidence. Paul admitted that he had at one time wanted to move the offices of the companies to Mansfield but that the volume of business there did not justify such move. Furthermore, he stated that he tried to spend only one working day each week in Mansfield. Therefore, as respondent argues, only that portion of the Neil House expenses which represented costs other than Paul's personal living expenses is not income to him. Although the record is not sufficient to enable us to make any exact determination, in accordance with the principle of Cohan v. Commissioner, supra, we have found that the following amounts of Neil House expenses did not represent payment of personal living expenses of Paul, which finding shall be reflected in the Rule 50 computation: $2,253.94
1946
2,823.64
1947
4,778.95
1948
6,690.20
1949
3,101.74 Also in this category are checks issued by Continental to various clubs of which Paul was a member. Some of such checks, e.g. those issued to Moose and Purdue alumnus, petitioners admit were entirely personal. The petitioners' position with respect to others is that Paul was a member of such clubs only because the company as such could not be a member, that the officers of the company used the club membership to entertain business guests and that such checks did not constitute payment of personal expenses of Paul. The only evidence offered to support this position is Paul's testimony. He admitted that in some instances the expenses paid were costs of meals eaten by him. He did not name any business guests who had been entertained at the clubs. Furthermore, some of the officers who Paul claimed used the memberships to entertain guests appeared as petitioners' witnesses in this case and no testimony was elicited from them with respect to any such use of the club memberships. However, in view of the general *104 testimony that a certain amount of entertainment was necessary for company business, even though the record is of very little help in determining the amount of personal as opposed to business entertainment represented by the club charges, in accordance with the Cohan rule, we have found that the following amounts represented business entertainment costs of the companies, were not for petitioners' personal expenses and are not income to them, which finding shall be reflected in the Rule 50 computation. 1945
$ 20.00
1946
191.01
1947
299.48
1948
154.34
1949
49.30
The next issue is whether in 1949 the petitioners realized gain from the sale of Mansfield Apartments and if so, in what amount. Respondent determined that on their income tax return petitioners reported short-term capital gain in the amount of $74,460.69 from such sale. Respondent made certain adjustments to basis and determined that petitioners realized profit in the amount of $105,912.66 and that such amount was taxable to petitioners as ordinary income. On brief respondent concedes that such gain should be taxable as gain from the sale of a capital asset. The petitioners contend on brief that they received no taxable income from the *105 sale of the Mansfield Apartments because (1) they did not own any interest in such apartments and (2) they received no part of the proceeds of such sale. Petitioners alternatively contend that the amounts of such gain is $68,509.46. The petitioners' first contention is without merit. The sale of the apartments arose out of an agreement between petitioners and the Bank whereby petitioners hoped to discharge their personal liability as guarantors on a note made by Continental and held by the Bank. Mansfield Apartments, Inc., which owned the apartments involved, was not liable for payment of such note, but pursuant to the agreement between petitioners and the Bank it transferred title of the apartments to the Bank in consideration of petitioners' canceling indebtedness owed by Mansfield Apartments, Inc., to Paul. The Bank subsequently sold the apartments and applied the proceeds to the Continental note and other indebtedness of petitioners. The balance of such proceeds was subsequently paid to Paul. In substance Paul acquired title to the apartments in consideration of his canceling all indebtedness owed to him by Mansfield Apartments, Inc., and then transferred title to the Bank which *106 sold the property and applied the proceeds to petitioners' indebtedness. Accordingly, petitioners not only had an interest in the property, but benefited from the sale to the extent the proceeds were applied to their outstanding indebtedness. Petitioners' alternative contention involves the computation of the amount of gain realized from the sale of the Mansfield Apartments. Proper computation of gain is encompassed by section 111(a), Internal Revenue Code of 1939, [4] which provides that gain from a sale of property is the excess of the amount realized therefrom over the adjusted basis as determined under section 113(b), Internal Revenue Code of 1939, [5] for the purposes here involved. Paul's adjusted basis in the Mansfield Apartments is their cost to him, as provided in section 113(a), Internal Revenue Code of 1939. [6] It is recognized that expenses incurred by the seller in making the sale, such as commissions, title opinion and attorney fees, are deductible in computing the amount of gain realized. Seletha O. Thompson, 9 B.T.A. 1342. Petitioners contend that the amount of gain should be computed as follows: Assumption of mortgage
$144,000.00
Cancellation of indebtedness
45,891.52
Cost Basis
$189,891.52
Sale Price: Mortgage assumed by purchaser
$144,000.00
Cash
125,000.00
Total Sale Price
$265,000.00
Cost of Sale: Revenue Stamps
$ 275.00
Attorneys' fees
855.34
Commission
13,450.00
Real Estate Taxes
2,018.68
16,599.02
Net Proceeds from Sale
$248,400.98
Gain
$ 68,509.46
*107 The figures in petitioners' computation are supported by the record and are not disputed by respondent, who apparently relies wholly upon the computation in the notice of deficiency. Petitioners have introduced sufficient evidence to show respondent's computation is incorrect. However, it does not appear from the record that the *108 real estate taxes paid from the proceeds of the sale were a deductible expense of such sale, and to that extent petitioners' computation is erroneous. Whether such taxes are deductible as taxes paid within the meaning of section 23(c)(1), Internal Revenue Code of 1939, for purposes of determining net income is of no concern in the instant case. Accordingly, petitioners' computation of gain must be increased by the amount of such erroneous deduction. We hold that petitioners realized short-term capital gain in the amount of $70,528.14 from the sale of the Mansfield Apartments. The next issue is whether in 1949 Paul sustained a loss within the meaning of section 23(e)(1), Internal Revenue Code of 1939, [7] *109 in the amount of $45,891.52 which represents the amount of a debt owed him by Mansfield Apartments, Inc. Respondent's position is that no loss has been incurred with respect to such debt. It is axiomatic that a loss deduction is allowable only when the taxpayer has proven that a loss in fact has been incurred. With respect to the debt owed Paul by Mansfield Apartments, Inc., the evidence not only fails to establish this requirement but in fact conclusively shows that gain was realized. The facts show that Paul canceled the debt in consideration for the corporation's transfer of the apartments to him or his nominee. The apartments were transferred to the Bank which applied their sale price to Paul's guarantor obligations. Since the amount received on sale exceeded Paul's cost (which included the cancellation of indebtedness) Paul realized gain therefrom and petitioners' claim that a loss was incurred is accordingly rejected. The next issue involves the deductibility of $19,125 and $100,000, which amounts respectively represent (1) proceeds from the sale of lots owned by petitioners, which proceeds were applied to petitioner's liability as guarantors of a note made by Continental, and (2) the amount paid to the Bank by petitioner to be applied to their liability as guarantors of a note made by Guarantee. The respondent's position is that such amounts are nonbusiness *110 bad debts within the meaning of section 23(k)(4), Internal Revenue Code of 1939, and are deductible as short-term capital losses under the provisions of that subsection. Petitioners contend on brief that such amounts are fully deductible as losses incurred in trade or business within the meaning of section 23(e)(1). Although section 23(e)(1) is the only provision upon which petitioners explicitly rely, it is clear from their argument on brief that reliance upon section 23(k)(1) is also involved. Accordingly, it is proper that we consider the application of that section to this issue. The provisions of sections 23(e) and 23(k) are mutually exclusive and a loss deductible under the latter provision may not be deducted under the former. Spring City Foundry Co. v. Commissioner, 292 U.S. 182; Charles G. Berwind, 20 T.C. 808, affd. 211 Fed. (2d) 575. Where a loss is attributable to the worthlessness of a debt, it shall be regarded as a bad debt loss, deductible as such or not at all. Putnam v. Commissioner, 352 U.S. 82. In that case the Supreme Court held that the loss sustained by a guarantor unable to recover from the debtor is by its very nature a loss from the worthlessness of *111 a debt. The principles of the Putnam case are apposite here. The parties agree that petitioners' losses respecting the Continental notes were losses which arose out of their grantor relationship. As such they are deductible only under section 23(k) and petitioners' claim that such losses are deductible under section 23(e) cannot be sustained. Nor under the facts are the petitioners entitled to deduct such losses under the provisions of section 23(k)(1)[8] *112 Under that section, as modified by section 23(k)(4), [9] a deduction is allowed for debts which become worthless within the taxable year and which are proximately related to the taxpayer's business. In the instant case respondent makes no contention that the debt did not become worthless in 1949. Thus the issue is narrowed to a question of whether the losses were proximately related to Paul's business. Petitioners' argument is that Paul was a "dealer in enterprises," that he devoted his entire time to the management, promotion and production thereof, that such activities constituted a business of Paul's and that the losses in issue are proximately related to such business. Whether a particular loss or expense is incurred in a taxpayer's trade or business is a question of fact in each *113 particular case. Higgins v. Commissioner, 312 U.S. 212. We recognize that in exceptional situations the taxpayer's activities in promoting, financing, managing and making loans to a number of corporations may be so extensive as to constitute a business separate and distinct from the business carried on by the corporations themselves, Charles G. Berwind, supra; Henry E. Sage, 15 T.C. 299; Vincent C. Campbell, 11 T.C. 510, and that losses resulting from such loans may qualify as a business bad debt if the loss is proximately related to such promotional business. However, where a taxpayer incurs losses resulting from his endorsement of notes made by a corporation or from his loans to it in an effort to protect his investment in its stock, such losses are not deductible as business bad debts, Burnet v. Clark, 287 U.S. 410; Samuel Towers, 24 T.C. 199, affd. 247 Fed. (2d) 233, certiorari denied 355 U.S. 914; Jan G. J. Boissevain, 17 T.C. 325. In the instant case the facts show that Paul acquired the stock of Guarantee and Continental during the period from 1936 to 1940. Apparently the companies were in poor financial condition when he acquired the stock interest, and Paul hoped *114 to rejuvenate them. Sometime later, Capital and Broad Realty were formed. Paul was active in the management of these companies. To some extent he cosigned notes for them. These activities petitioners urge constitute a trade or business of Paul. We do not agree. There is no evidence here that Paul was constantly seeking business opportunities in which to invest his money and time in the hope of making a profit as in Henry E. Sage, supra, and Giblin v. Commissioner, 227 Fed. (2d) 692, reversing a Memorandum Opinion of this Court [13 TCM 1009; T.C. Memo. 1954-186], which are relied upon by petitioners. In those cases the taxpayer had a long history of such promotional activity. The evidence in the instant case shows that Paul was not engaged in any promotional business but was a stockholder or salaried officer of these companies and that he was endeavoring to make a financial success of such companies in order that he might realize income in his capacity as officer and/or stockholder thereof. Cf. Samuel Lanski, 34 B.T.A. 1019. Furthermore, it is admitted by petitioners that the losses in issue arose out of Paul's unsuccessful attempt to salvage a portion of his investment in the *115 companies, not out of any activity relating to promotion. The evidence does not show that Paul was in the lending or guarantor business, nor do petitioners make such contention. Accordingly we sustain respondent's position that the losses are from a nonbusiness debt within the meaning of section 23(k)(4). On brief, petitioners for the first time claimed a net operating loss carryback under the provisions of section 122 and section 23, Internal Revenue Code of 1939, with respect to such losses. Aside from the fact that our determination that such losses constitute nonbusiness bad debts is sufficient to demonstrate that they cannot be factors in determining a net operating loss for carry-back purposes, since they were not attributable to the operation of a trade or business regularly carried on, petitioners' mention of such claim at this late date is not sufficient to put the question properly in issue before us. Sicanoff Vegetable Oil Corporation, 27 T.C. 1056, reversed on other grounds, 251 Fed. (2d) 764. The last question to be determined is whether any part of the deficiency for each of the years involved was due to fraud with intent to evade tax. If so, petitioners are liable *116 for the 50% additions to tax proscribed by section 293(b) of the Internal Revenue Code of 1939, [10] as determined by respondent. The question of fraud is a factual one and the burden of proof is upon respondent. Section 1112, Internal Revenue Code of 1939. Fraud is never to be presumed. Where, as in the instant case, fraud is not admitted, respondent has the burden of proving fraud by clear and convincing evidence. Henry S. Kerbaugh, 29 B.T.A. 1014, affd. 74 Fed. (2d) 749; Arlette Coat Co., 14 T.C. 751; W. A. Shaw, 27 T.C. 561, affd. 252 Fed. (2d) 681. In our opinion, respondent has not sustained his burden with respect to the issue of fraud in the instant case. The charge of fraud herein is based primarily, as alleged in the answer, upon the allegations that petitioners failed to report in their income tax returns for each *117 of the years involved, substantial amounts of income, consisting of personal expenses paid for by the corporations which Paul owned or controlled. It is to be noted that the income tax returns for the years involved were not placed in evidence. Nor is there any evidence as to what was shown in the returns. Accordingly, there is nothing in the record (other than the notice of deficiency) as to what income was reported. In Drieborg v. Commissioner, 225 Fed. (2d) 216, affirming in part and reversing in part a Memorandum Opinion of this Court [13 TCM 170], the Sixth Circuit Court of Appeals held that the failure to place the returns themselves in evidence or evidence of what was contained in the returns was fatal to respondent's determination of additions to tax for fraud. Cf. Alex Rubinstein, 29 T.C. 861 (Feb. 17, 1958). On brief respondent argues that the "overall indication of fraudulent actions by the taxpayers is provided by the size of the deficiencies." We recognize that the consistent and substantial understatement of income over a period of years may constitute clear and convincing evidence of fraud. Holland v. United States, 348 U.S. 121; Epstein v. United States, 246 Fed. (2d) 563, *118 certiorari denied 355 U.S. 868; W. A. Shaw, supra.In the instant case we have sustained respondent's determination of substantial deficiencies in each of the years involved for the reason that the petitioners, upon whom the burden rested, have failed to overcome the presumptive correctness of respondent's determination. This, however, is not sufficient in and of itself to establish fraud. James Nicholson, 32 B.T.A. 997, affd. 90 Fed. (2d) 978; Estate of Louis L. Briden, 11 T.C. 1095, affd. sub nom Kirk v. Commissioner, 179 Fed. (2d) 619. As stated in Drieborg v. Commissioner, supra: "At the outset it should be emphasized that the failure of the taxpayers to overcome the presumptive correctness of the deficiencies, even though those deficiencies cover a consecutive ten year period, cannot be regarded, in and of itself, as sufficient proof that the deficiencies or any part thereof were due to fraud on the part of the taxpayers. To hold otherwise would be to ignore the statute which imposes on the Commissioner the burden of proving fraud, and the often repeated admonition that such proof must be by clear and convincing evidence. Wisely v. Commissioner, 6 Cir., 1950, 185 Fed. (2d) 263; *119 Rogers v. Commissioner, 6 Cir., 1940, 111 Fed. (2d) 987, 989; Mitchell v. Commissioner, 5 Cir., 1941, 118 Fed. (2d) 308. There must be additional independent evidence from which fraudulent intent on the part of the taxpayer can be properly inferred. See Rogers v. Commissioner, supra.
"That the difference in the burden of proving ordinary tax deficiencies and civil fraud can have important practical results has long been recognized. 'As to the issue raised by [the Commissioner's] determination of fraud the burden is upon him; and he may fail to sustain such burden, notwithstanding the determined and presumed error in the return. In other words, both parties may fail through inadequate proof on their several issues, and thus the deficiency would be sustained and the penalty set aside.' L. Schepp Co., 1932, 25 B.T.A. 419, 437." As additional "indicia of fraud" respondent, on brief, has also pointed to (1) the constant pattern and practice over the years involved of the payment of petitioner's personal obligations by his controlled corporations; (2) petitioners' failure to produce books and records presumed to be unfavorable to them; (3) petitioner's personal history, his education, *120 business experience and skill, as indicating an intelligence and awareness of his tax responsibilities; and (4) absence of any proof or explanation of petitioners' failure to recognize corporate expenditures in their behalf. Respondent's reliance thereon, however, apparently ignores the fact that the burden of proof is on the respondent and in any event does not, in our opinion, constitute clear and convincing evidence of fraud on the part of petitioners. Considering all the facts and circumstances we hold that respondent has not sustained his burden of establishing that a part of the deficiency for each of the years involved was due to fraud with intent to evade tax. Decisions will be entered under Rule 50. Footnotes
1. Amount of checks upon which determination is based is $8,655.03. ↩
3. Amount of checks upon which determination is based is $14,180.38. ↩
2. Amount of checks upon which determination is based is $51,757.00. ↩
4. Respondent erroneously included a $450 check already included in checks determined to be issued by Broad Realty in 1947 in the amount of $59,757.24. ↩
5. The checks upon which this determination is based were issued by Capital, Guarantee, and Property Management and the aggregate amount thereof is $59,769.66.↩
1. SEC. 22. GROSS INCOME. (a) General Definition. - "Gross income" includes gains, profits, and income derived from salaries, wages, or compensation for personal service (including personal service as an officer or employee of a State, or any political subdivision thereof, or any agency or instrumentality of any one or more of the foregoing), of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever.↩
2. Cohan v. Commissioner, 39 Fed. (2d) 540↩.
3. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. (1) Trade or business expenses. - (A) In general. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; * * *↩
4. SEC. 111. DETERMINATION OF AMOUNT OF, AND RECOGNITION OF, GAIN OR LOSS. (a) Computation of Gain or Loss. - The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 113(b) for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized. * * *↩
5. SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS. * * *
(b) Adjusted Basis. - The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis determined under subsection (a), adjusted as hereinafter provided. * * *↩
6. SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS. (a) Basis (Unadjusted) or Property. - The basis of property shall be the cost of such property; * * *↩
7. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(e) Losses by Individuals. - In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise - (1) if incurred in trade or business; * * *
8. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(k) Bad Debts. - (1) General rule. - Debts which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * * ↩
9. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(k) Bad Debts. - * * *
(4) Non-business debts. - In the case of a taxpayer, other than a corporation, if a non-business debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. The term "non-business debt" means a debt other than a debt evidenced by a security as defined in paragraph (3) and other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. * * *↩
10. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. * * *
(b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612(d)(2)↩.